EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Jacqueline M. Siaca<br><br>Peticionaria<br><br>v.<br><br>Bahía Beach Resort & Golf Club, LLC., Interlink Realty, Corp.<br><br>Recurridos | Certiorari<br><br>2016 TSPR ___<br><br>194 DPR ____ |

Número del Caso: AC-2012-102

Fecha: 25 de enero de 2016

Tribunal de Apelaciones:

>    Región Judicial de Bayamón, Aibonito y Humacao

 Abogado de la parte Peticionaria:

>    Lcdo. Fernando Luis Figueroa Gordián

 Abogado de la parte Recurrida:

>    Lcdo. José L. Colom Fagundo

Materia: Derecho Laboral – Ley Núm. 427-2000: Derecho de la mujer trabajadora a elegir la lactancia como método para alimentar a su recién nacido; Derecho constitucional a la intimidad.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jacqueline M. Siaca

     Peticionaria

                             Certiorari

     v.                      AC-2012-102

Bahía Beach Resort & Golf Club, LLC., Interlink Realty, Corp.

     Recurridos

Opinión del Tribunal emitida por la Jueza Presidenta señora FIOL MATTA

> La petición ante los poderes públicos para el restablecimiento del derecho hollado o de la justicia olvidada, no solamente es una necesidad individual y colectiva, sino también el reconocimiento, la consagración popular de aquellos mismos poderes. La libertad personal y la seguridad del hogar doméstico, son garantías que, como todos los derechos individuales, no puede ni renunciar ni delegar ningún pueblo libre. Los llamamos ilegislables,... [y] los tribunales de justicia deben estar investidos del poder de revocar, o dejar sin efecto toda ley atentatoria a los derechos del [ser humano]. Cualquier ficción, cualquier mayoría que pretenda regularlos atenuándolos, limitándolos o desvirtuándolos, marcha consciente o inconscientemente en la senda de la tiranía.
>
>     Román Baldorioty de Castro[1]

---

[1] Tomado del discurso de Jorge Font Saldaña ante la Asamblea Constituyente, 1 Diario de Sesiones de la Convención Constituyente, pág. 389 (1951).

En San Juan, Puerto Rico, a 25 de enero de 2016.

La presente controversia nos brinda la oportunidad de analizar las políticas públicas establecidas en protección de la mujer trabajadora que toma la decisión personalísima de amamantar o extraerse leche materna para su hijo o hija recién nacido. Específicamente, la Ley Núm. 427-2000, infra, reconoció el derecho de la mujer trabajadora a elegir la lactancia materna como método para alimentar a su recién nacido aún después de regresar al lugar de trabajo. Para ello, le impuso la obligación al patrono, ya sea este privado o público, de proveer a su empleada un período de amamantamiento o extracción de leche dentro de su jornada laboral. Además, el patrono tiene la obligación de habilitar un espacio que sea privado, seguro e higiénico para que se pueda llevar a cabo este proceso de extracción.

Estas no son aspiraciones u obligaciones a ser cumplidas a discreción del patrono. Por el contrario, consciente de la importancia que esto reviste para la mujer trabajadora, la Asamblea Legislativa creó un deber legal que los patronos deben cumplir siempre que una madre trabajadora lo exija por razón de haber elegido la lactancia materna como método de alimentación para su

recién nacido. En esta Opinión reconocemos esta realidad jurídica y reforzamos la legislación laboral protectora de nuestras trabajadoras, derrumbando prácticas que durante demasiado tiempo han afectado el derecho de una madre a decidir, en la intimidad de su conciencia y libre de presiones laborales, qué alimento quiere dar a su recién nacido.

I.

La señora Jaqueline M. Siaca comenzó a trabajar para la empresa Bahía Beach Resort & Golf Club, LLC., (Bahía Beach) el 5 de noviembre de 2007.[2] En ese momento, partes de la propiedad se encontraban aún en construcción,[3] aunque muchas otras estaban totalmente finalizadas y en condiciones para operar, incluyendo la zona residencial, el área de los "walk-ups" conocidas como "Las Verandas", y la casa club. Originalmente, la señora Siaca solicitó empleo como oficial de seguridad pero, debido a su experiencia, su patrono decidió ofrecerle el puesto de

---

[2] Bahía Beach es un complejo turístico-residencial estilo "walk-up" y de residencias privadas. También administra un campo de golf para uso de sus residentes y de los huéspedes del Hotel St. Regis. Al momento de los hechos, el Hotel St. Regis se encontraba en construcción y el acceso era a través del área de Bahía Beach.

[3] Como cuestión de hecho, surge de la prueba testifical que tanto las oficinas de recursos humanos de Bahía Beach, como las oficinas de los ingenieros, arquitectos y demás personal que laboraba en la construcción del Hotel St. Regis se encontraban en vagones de carga como los que se utilizan en los muelles para transportar mercancías.

supervisora en el departamento de seguridad.[4] Parte de sus funciones consistían en inspeccionar los demás puestos de vigilancia, verificar que se siguiera el protocolo de seguridad y preparar informes. Además, la señora Siaca declaró durante el juicio que también ejercía funciones de oficial de seguridad cuando no había otro oficial disponible, dando rondas de seguridad tanto en las áreas residenciales como en el área de construcción y controlando el acceso vehicular en el portón principal.

A inicios del año 2008, la señora Siaca quedó embarazada de su primera hija. Cerca ya la fecha de parto, comenzó a agotar la licencia de maternidad a la que tenía derecho.[5] El 19 de diciembre de 2008, mientras aún disfrutaba de su licencia de maternidad, acudió a las oficinas de recursos humanos de Bahía Beach y allí le entregó a la señora Aixa Olavarrieta Archilla el certificado de nacimiento de su hija con el propósito de añadirla a su plan médico.[6] Además, le informó a la

---

[4] La señora Siaca fue militar durante nueve años y trabajó cuatro años en el Gobierno federal para el Departamento de "*Homeland Security*" desempeñándose como "*Lead Security Officer*" en el aeropuerto.

[5] El 3 de noviembre de 2008 nació la hija de la señora Siaca.

[6] La señora Olavarrieta Archilla era oficial de recursos humanos de la compañía Human Capital and Labor Consulting Services (Human Capital), una firma de consultoría subcontratada por Bahía Beach para administrar todo lo referente al área de recursos humanos de la empresa. Para la fecha de los hechos, la señora Olavarrieta Archilla era la encargada de recursos humanos en Bahía Beach, y ella coordinaba todo lo referente a las licencias, beneficios, acciones de personal, etc., en beneficio de Bahía Beach.

señora Olavarrieta que estaba amamantando a su hija y que era su intención continuar haciéndolo una vez se reincorporara a su trabajo. La señora Siaca también informó su decisión de continuar alimentando a su hija con leche materna a su supervisora directa, la señora Marisol González.

El 12 de enero de 2009 la señora Siaca se reintegró a sus labores. Al solicitarle a su supervisora el período para extraerse leche materna, esta le indicó que podía utilizar un baño para ese propósito.[7] La señora Siaca se sintió ofendida por este ofrecimiento y le expresó a su supervisora que el baño no era una alternativa para realizar la extracción de leche y almacenar el alimento de su hija debido a los gérmenes y la pobre higiene de ese tipo de lugar. Su supervisora la refirió a la oficina de recursos humanos para que se atendiera su situación. Allí, una persona que estaba sustituyendo a la señora Olavarrieta Archilla durante sus vacaciones le autorizó el uso de una oficina contigua a la oficina de recursos humanos.[8] Esta oficina quedaba como a cinco minutos a pie

---

[7] La Ley Núm. 427-2000, infra, establece que el patrono debe conceder a la empleada un período de una hora, dentro de su jornada laboral, para extracción de leche materna. Este período se podrá dividir en dos periodos de treinta minutos o tres de veinte minutos. La señora Siaca dividió el suyo en dos periodos de treinta minutos, uno en la mañana y otro en la tarde. Para realizar esta función, la señora Siaca contaba con una máquina de extracción de leche y una neverita en la cual almacenaba la leche extraída hasta llegar a su casa.

[8] Durante su testimonio en el juicio, la señora Siaca identificó a esta persona solo por su nombre, Elizabeth.

del puesto regular de trabajo de la señora Siaca, contaba con aire acondicionado, tenía un escritorio con una butaca y dos ventanas de cristal que miraban hacia la parte frontal del vagón y hacia uno de los lados. Las ventanas de cristal de la oficina no tenían cortinas lo cual representaba un problema para la señora Siaca pues se sentía muy incómoda al tener que desnudar su torso para el proceso de extracción de leche y preocupada de que alguien pudiera observarla desde la ventana del vagón.[9] Por esta razón, pidió permiso para tapar las ventanas de cristal con papel tamaño legal, y aunque se le permitió hacerlo, acondicionar el área para proteger su privacidad le ocupaba parte del tiempo que tenía para la extracción de leche.

La señora Siaca utilizó este lugar desde el mes de enero hasta el mes de abril de 2009, cuando se le informó que la oficina se iba a utilizar por una persona recién contratada por Bahía Beach. Se le asignó entonces un vagón que, según le indicó el Gerente General del proyecto, podía utilizar en lo que le conseguían una solución "más permanente".

---

[9] La señora Siaca testificó que los empleados que laboraban en el complejo, personal de jardinería y del campo de golf, acudían al vagón donde se encontraba la oficina de recursos humanos y, al encontrar la puerta cerrada, se asomaban por la ventana de la oficina que ella estaba utilizando, para ver si había alguien que les abriera la puerta. Al hacer esto observaban a la señora Siaca en el proceso de extracción de leche, lo que la hacía sentir muy incómoda y "violada". Ella notificó de esta situación a sus supervisores y a la señora Olavarrieta.

El nuevo lugar asignado para la extracción de leche se encontraba en medio del área de construcción del Hotel St. Regis y estaba mucho más apartado del lugar donde la señora Siaca normalmente realizaba su trabajo.[10] A este nuevo lugar tenía acceso mediante un camino de tierra y utilizando un carrito de golf de tracción en las cuatro ruedas. La trayectoria entre el lugar de trabajo de la señora Siaca y el lugar asignado para la extracción de leche, según su testimonio, tomaba entre 14 y 16 minutos ida y vuelta, tiempo que se restaba al periodo de extracción.[11] Esta situación le trajo inconvenientes con sus compañeros de trabajo, quienes comenzaron a quejarse que los periodos de descanso de la señora Siaca eran muy largos y llegaba tarde a sus labores,[12] situación que la ponía tensa y la hacía sentir frustrada ya que no podía cumplir ni con su función como empleada ni con el proceso de extracción de leche, el cual trataba de realizar a toda prisa. La señora Siaca testificó que incluso dentro del periodo establecido para la extracción de leche la

---

[10] Los empleados se referían al lugar de la construcción como "la jungla".

[11] En un día seco y soleado, la señora Siaca tardaba cerca de 7 u 8 minutos en llegar a su nueva área de lactancia utilizando el carrito de golf. Ese tiempo se restaba a su período de extracción de leche. Si multiplicamos ese periodo de tiempo por dos, considerando que la señora Siaca debía realizar el mismo trayecto de regreso, vemos que la peticionaria perdía entre 14 a 16 minutos de su periodo de extracción de leche de 30 minutos tan solo en el esfuerzo de transportación. Apéndice, pág. 611.

[12] De hecho, durante este periodo la señora Siaca fue amonestada y suspendida de su empleo por sus tardanzas y ausencias. Eventualmente, perdió su puesto de supervisión.

llamaban por radio y por teléfono para solicitarle que se reportara a su área de trabajo.

Además de la lejanía que suponía este segundo lugar que le asignaron para extraerse leche materna, la señora Siaca testificó que las condiciones físicas del lugar no eran higiénicas ni apropiadas para realizar dicha función. La oficina asignada era utilizada por la constructora como un cuarto de archivos y el espacio se encontraba ocupado casi en su totalidad por anaqueles de cuatro o cinco gavetas. La oficina tenía disponible un solo receptáculo eléctrico ya que todos los demás estaban bloqueados por los anaqueles de archivo. Además, aunque la oficina contaba con aire acondicionado, había humedad y moho en los conductos, lo que propiciaba una pobre higiene y la aparición de cucarachas y otros insectos. La oficina contaba con una mesa de *rattan* o mimbre, difícil de limpiar según el testimonio de la peticionaria, y una silla del mismo material.

La señora Siaca utilizó la oficina en el vagón de la constructora desde abril hasta principios de septiembre de 2009. Durante ese periodo, fue interrumpida por personal de la constructora en dos ocasiones distintas mientras se extraía leche materna. Estas personas entraban a la oficina sin avisar, utilizando llaves adicionales que tenían en su poder, a pesar que el letrero que ella utilizaba indicaba "Madre Lactante –

Favor No Interrumpir". Estos incidentes fueron reportados a la supervisora de la señora Siaca, sin que se tomaran medidas para reubicarla. Además, el aire acondicionado de la oficina se dañó y tampoco se tomaron medidas para repararlo o reubicar a la señora Siaca por esa razón. Finalmente, a principios del mes de septiembre de 2009, la peticionaria acudió a su lugar de extracción de leche como de costumbre y encontró que el mismo estaba completamente ocupado por cajas con materiales y equipo de construcción.

Luego de reportar esta situación, se le asignó temporeramente un lugar en las facilidades de la Casa Club del complejo de Bahía Beach. Sin embargo, ese espacio estuvo disponible tan sólo por un fin de semana, luego de lo cual la peticionaria fue ubicada nuevamente en el vagón de la oficina de Recursos Humanos, pero esta vez en un cuarto de almacenamiento. La señora Siaca utilizó este nuevo espacio desde septiembre de 2009 hasta el 12 de enero de 2010, cuando finalizó su período de lactancia. El lugar fue descrito como un espacio pequeño, un "pasillito", en el cual había un armario con uniformes de los empleados, equipo de cocina, equipo de deportes, alfombras ya utilizadas, cajas de distintas bebidas y servidores de computadoras. El aire acondicionado tenía el mismo problema de humedad y moho en sus conductos, además de una gotera. La señora Siaca usaba una mesa y

una silla que quedaban justo debajo del sistema de ventilación del aire acondicionado, por lo que la gotera constantemente ensuciaba el área que ella debía utilizar. Finalmente, en este tercer lugar también sucedió que un empleado, el encargado del mantenimiento de los sistemas de información de Bahía Beach, entró de golpe al cuarto para tener acceso a los servidores que se encontraban en dicho lugar, a pesar de que la señora Siaca había colocado su letrero de madre lactante y se encontraba en el proceso de extracción de leche. Nuevamente, no se tomó ninguna medida para evitar que este tipo de incidente se repitiera, a pesar de sus reclamos de un lugar adecuado para el proceso de extracción.

Todos estos contratiempos que tuvo que enfrentar la señora Siaca para poder ejercer su derecho a un tiempo y un lugar adecuados para extraer el alimento de su hija le causó problemas tanto físicos como emocionales. La señora Siaca testificó que al regresar de su licencia de maternidad, y luego de comenzar a experimentar todos los contratiempos que le trajo su decisión de lactar a su hija, se redujo su producción de leche materna.[13] Esto la afectó emocionalmente y tuvo que recibir ayuda psiquiátrica. Se le diagnosticó depresión, y se le

---

[13] Surge del testimonio de la señora Siaca que, antes de regresar a su trabajo, se extraía 6 onzas de leche materna tres veces al día. Una vez comenzó a trabajar, su producción de leche bajó a 6 onzas dos veces al día y al cabo de mes y medio de haber regresado a su trabajo, su producción era de aproximadamente 2 onzas al día.

recetaron medicamentos anti-depresivos los cuales utilizó por cerca de un año.

El testimonio de la señora Siaca en torno a las causas de la disminución en la producción de leche materna fue sustentado por el perito de la parte demandante, el Dr. Mario Ramírez Carmoega.[14] Durante el juicio, el Dr. Ramírez Carmoega declaró que el estrés era una causa de disminución en la producción de leche materna toda vez que inhibe la producción de las hormonas prolactina y oxitocina, las cuales intervienen directamente en la producción y bajada de la leche materna. El perito testificó que evaluó el expediente del tratamiento psiquiátrico de la señora Siaca y las terapias de seguimiento que había recibido, y concluyó que en efecto ella sufría de depresión. Expuso que la depresión es un factor estresante que contribuye a la disminución en la producción de leche materna.

Al no lograr que su patrono le proveyera un espacio adecuado para poder realizar el proceso de extracción de leche, la señora Siaca demandó a Bahía Beach.[15] Alegó que

---

[14] El Dr. Ramírez Carmoega es pediatra y fue calificado por el foro de instancia como experto en lactancia materna. Bahía Beach no presentó ningún testimonio pericial durante el juicio.

[15] En su demanda, la señora Siaca incluyó como codemandados a Human Capital & Labor Consulting Services, Inc., y a Interlink Realty Corp., desarrolladora del Hotel St. Regis. Sin embargo, las alegaciones en contra de ambas codemandadas no prosperaron a nivel de instancia ya que se determinó que Bahía Beach era el único patrono de la señora Siaca. Después de presentada la demanda, la señora Siaca fue despedida de su empleo por razones no relacionadas a su reclamo.

los espacios que Bahía Beach le proveyó para realizar el proceso de extracción de leche materna estaban en condiciones deplorables, inseguras e insalubres, lo cual le había impedido ejercer su derecho a extraerse leche materna en su lugar de empleo. Además, la señora Siaca adujo que la falta de diligencia de Bahía Beach en proveerle un espacio adecuado violentó su derecho a la intimidad, ya que los espacios provistos la dejaron vulnerable a ser vista por sus compañeros de trabajo mientras realizaba el proceso de extracción de leche, lo que en efecto ocurrió en varias ocasiones. Por último, alegó que el hecho de no proveerle un espacio adecuado para ejercer su derecho a la extracción de leche restringió el ejercicio de ese derecho.

Luego de aquilatar los testimonios de la señora Siaca y el Dr. Ramírez Carmoega y el testimonio de la señora Aixa Olavarrieta Archilla como única testigo de la demandada Bahía Beach,[16] el Tribunal de Primera Instancia declaró con lugar la demanda. El Tribunal otorgó entera credibilidad al testimonio de la señora Siaca y del Dr. Ramírez Carmoega y entendió probado que a la peticionaria no se le brindaron espacios adecuados para realizar el

---

[16] El Tribunal de Primera Instancia admitió en evidencia, por estipulación de las partes, el Manual de Empleados de Bahía Beach Resort & Club, que garantizaba a sus empleados un periodo de lactancia en un lugar privado; 33 fotografías tomadas por la señora Siaca que mostraban los lugares que el patrono le proveyó para extraerse leche materna; la hoja de descripción de los puestos de los oficiales de seguridad de Bahía Beach y la hoja de consentimiento del empleado al Manual de Empleados de Bahía Beach.

proceso de extracción de leche, que en varias ocasiones otros empleados le abrieron la puerta de la oficina asignada mientras estaba en pleno proceso de extracción de leche, que las situaciones que estaba enfrentando la señora Siaca en su lugar de trabajo la hacían sentir marginada y requirieron ayuda psiquiátrica y medicamentos anti-depresivos, y que el testimonio incontrovertido del Dr. Ramírez Carmoega demostró que las situaciones estresantes que experimentó la señora Siaca en su trabajo provocaron una disminución en su producción de leche materna de 18 onzas diarias a sólo 2 onzas diarias.

El foro sentenciador concluyó que los lugares ofrecidos por Bahía Beach a la señora Siaca violaron el mandato de la Ley Núm. 427-2000, infra, al ser inseguros e insalubres ya que se encontraban llenos de cajas, archivos y otros objetos que acumulaban polvo y sucio, lo que podía exponer a la señora Siaca y a su hija a complicaciones de salud.

Inconforme con esta determinación, Bahía Beach presentó un recurso de apelación ante el Tribunal de Apelaciones. Ese foro revocó al Tribunal de Primera Instancia. Razonó que la Ley Núm. 427- 2000, infra, no expresaba con claridad los requisitos que debía cumplir un cuarto de lactancia y que no se podía entender que la Asamblea Legislativa le impuso a los patronos privados la obligación de construir facilidades permanentes para

acomodar la necesidad de extracción de leche de sus empleadas porque esto resultaría en una carga económica muy onerosa.

El Tribunal de Apelaciones concluyó que Bahía Beach había provisto el tiempo y el espacio para que la señora Siaca pudiera extraerse leche materna y que, como se trataba de un lugar en construcción, los espacios que tenía que usar la recurrente eran los que estuvieran disponibles. Resolvió el foro apelativo que la prueba testifical no demostró que la señora Siaca no pudo disfrutar de su periodo de extracción de leche o que Bahía Beach no proveyó lugares adecuados para realizar dicha función.

En desacuerdo con la determinación del Tribunal de Apelaciones, la señora Siaca recurrió en apelación ante este Tribunal. Acogido su recurso como certiorari, decidimos expedir en reconsideración.

                                II.

   A. La Lactancia: amamantamiento y extracción de leche
      materna

La alimentación de un recién nacido con leche materna se realiza principalmente mediante dos procesos: el amamantamiento y la extracción de leche materna. El amamantamiento se refiere a la alimentación del recién nacido directamente del seno, mientras que la extracción de leche comprende el que la madre se extraiga la leche del pecho y alimente al recién nacido con leche materna

utilizando una botella, vaso o algún otro medio.[17] Ambas técnicas procuran y aseguran que el recién nacido se alimente con leche materna durante las primeras etapas de su vida.

La literatura especializada en el tema es abundante y señala claramente que la alimentación de un recién nacido utilizando leche materna es la mejor alternativa posible.[18] La leche materna es una sustancia viva que tiene propiedades inmunológicas y anti-inflamatorias que protegen a los recién nacidos y a sus madres contra una variedad de enfermedades y condiciones.[19] Los estudios científicos en este campo apuntan a beneficios tanto

---

[17] En el idioma inglés, comúnmente se utiliza la palabra "breastfeeding" para referirse a ambos métodos de alimentación. Sin embargo, es importante establecer la diferencia entre ambos conceptos toda vez que nuestra legislación en este campo protege tanto a la madre trabajadora que amamanta como a aquella que se extrae leche materna.

[18] Hay que aclarar que el objetivo de la política pública de la Ley Núm. 427-2000 no es juzgar los motivos o las circunstancias que enfrentan las madres puertorriqueñas al momento de decidir la mejor manera de alimentar a sus hijos o hijas. Por el contrario, lo que hoy buscamos reconocer es el derecho de una madre trabajadora a elegir cómo alimentar a su recién nacido, ya sea la lactancia o la alimentación mediante sustitutos de leche materna, sin que su patrono tenga un poder de veto sobre esta decisión que pertenece únicamente a cada una de ellas.

[19] U.S. Department of Health and Human Services. The Surgeon General's Call to Action to Support Breastfeeding. Washington, DC: U.S. Department of Health and Human Services, Office of the Surgeon General; 2011, a la página 1. Véase, además, Ruth A. Lawrence, A Review of the Medical Benefits and Contraindications to Breastfeeding in the United States, Maternal & Child Health Tech. Info. Bull. (Nat´l Ctr. Edu. Maternal & Child Health, 1997), págs. 4 – 5. (Breastfeeding protects against gastrointestinal, respiratory, and urinary tract infections. Breastfeeding has also been linked to reduced risks of cancer, insulin-dependent diabetes, and eczema in children).

físicos como emocionales para los recién nacidos, entre los que se encuentran menor riesgo de padecer de infecciones comunes, diabetes tipo 2, muerte súbita infantil y obesidad infantil. Para las madres representa, entre otros beneficios, un menor riesgo de padecer cáncer de seno, u ovárico y depresión post-parto.[20]

La lactancia como el método ideal para alimentar a los infantes está respaldada por prácticamente la totalidad de las organizaciones de salud que se han expresado sobre el tema.[21] En Puerto Rico, desde el año

---

[20] *Véanse*, The Surgeon General's Call to Action to Support Breastfeeding, supra, a la pág. 1, citando el estudio de Ip S Chung M, Raman G, Magula N, DeVine D, *et al.*, Breastfeeding and maternal and infant health outcomes in developed countries: evidence report/technology assessment no. 153. Rockville, MD: Agency for Healthcare Research and Quality; 2007. AHRQ Publication No. 07 – E007; Bachrach VR, Schwarz E, Bachrach LR, Breastfeeding and the risk of hospitalization for respiratory disease in infancy: a meta-analysis. Arch Pediatr Adolesc Med 2003; 157: 237–243; Collaborative Group on Hormonal Factors in Breast Cancer, Breast cancer and breastfeeding: collaborative reanalysis of individual data from 47 epidemiological studies in 30 countries, including 50302 women with breast cancer and 96973 women without the disease. Lancet 2002;360:187–195, y a Bernier MO, Plu-Bureau G, Bossard N, Ayzac L, Thalabard JC, Breastfeeding and risk of breast cancer: a meta-analysis of published studies. Hum Reprod Update 2000; 6:374–386; Mancini F, Carlson C, Albers L. Use of the Postpartum Depression Screening Scale in a collaborative obstetric practice. J Midwifery Women's Health 2007; 52:429–434.

[21] La lactancia materna está respaldada por las siguientes organizaciones asociadas a la salud en Estados Unidos: American Academy of Pediatrics (AAP), American Academy of Family Physicians, American College of Obstetricians and Gynecologists, American College of Nurse-Midwives, American Dietetic Association, y American Public Health Association. Todas estas organizaciones recomiendan que la leche materna sea el alimento exclusivo de los infantes durante los primeros seis meses de vida, lo que significa que estos no deben recibir ningún otro alimento o líquidos durante dicho periodo, ni siquiera agua. U.S. Department of Health and Human Services. The Surgeon General's Call to Action to Support Breastfeeding, supra, a la pág. 4.

1995 el Departamento de Salud estableció como política pública la promoción de la lactancia materna.[22] Según esta política pública, la lactancia materna óptima se logra al alimentar al recién nacido exclusivamente con leche materna durante los primeros seis meses de vida.[23] Además, el Departamento de Salud adoptó como una de sus metas el "[l]ograr que se reconozca el derecho de la madre a elegir y llevar a cabo la práctica de la lactancia materna sin discrimen, coherción [sic] o cohartación [sic] de sus derechos".[24]

B. El Derecho a la lactancia en la legislación de Estados Unidos y en el campo internacional

En 1964, el Congreso de Estados Unidos aprobó el "Child Nutrition Act", el cual reconoció la lactancia materna es el mejor método para la nutrición infantil.[25] Esta legislación provee para la asignación de fondos federales para el desarrollo de programas de educación sobre la lactancia en hospitales y otras instituciones dedicadas al cuidado de la salud. Recientemente, el "Affordable Care Act" de 30 de marzo de 2010, introdujo en su sección 4207 una enmienda a la "Fair Labor

---

[22] Departamento de Salud de Puerto Rico, Política Pública para la Promoción de la Lactancia en Puerto Rico, 1995. Disponible en: http://www.rcm.upr.edu/mch/politica_publica_lactancia.htm (última visita 8 de julio de 2015).

[23] Íd., pág. 14.

[24] Íd., pág. 17.

[25] 42 U.S.C. §§ 1771 – 1790 (1994).

Standards Act" (FLSA de 1938).[26] La enmienda obliga a los patronos a proveer un periodo razonable de tiempo a una empleada para extraerse leche materna para su hijo o hija durante un año desde el nacimiento del niño o niña, siempre que la empleada tenga necesidad de hacerlo. El patrono deberá, además, proveer a la empleada un lugar adecuado para realizar la extracción de leche materna, que no sean los baños, que esté protegido de la vista y libre de la intrusión de otros empleados y del público.[27] La enmienda obliga a todos los patronos por igual, pero si su cumplimiento se torna demasiado oneroso, los patronos con cincuenta empleados o menos quedan exentos de su cumplimiento.[28] El patrono no tiene que compensar a la empleada por el periodo que ésta utilice en el proceso de extracción de leche.[29]

Por otro lado, en la esfera estatal, un total de 27 estados, además del Distrito de Columbia, han aprobado legislación que protege a la mujer trabajadora y le conceden, en la mayoría de los casos, el derecho a lactar o extraerse leche materna en el lugar de trabajo.[30]

---

[26] 29 U.S.C. § 207(r).

[27] Íd., § 207(r)(1)(B).

[28] Íd., § 207(r)(3).

[29] Íd., § 207(r)(2).

[30] Arkansas, Ark. Stat. Ann. § 11-5-116 (2009); California, Cal. Labor Code § 1030 et seq. (2001); Colorado, Colo. Rev. Stat. § 8-13.5-101 et seq. (2008); Connecticut, Conn. Gen.

En el plano internacional, se han adoptado convenciones y tratados internacionales que reconocen los beneficios de la lactancia materna y garantizan el derecho de los niños y niñas recién nacidos a ser alimentados con esta. Estos instrumentos internacionales promueven este tipo de alimentación como la manera ideal de nutrir a los infantes en sus primeros meses de vida.

El 20 de noviembre de 1989 la Asamblea General de las Naciones Unidas aprobó la resolución 44/25 que contiene la "Convención sobre los derechos del Niño".[31]

---

Stat. § 31-40w (2001); Delaware, Del. Code Ann. tit. 31 § 310 (1997); Georgia, Ga. Code § 34-1-6 (1999); Hawai´i, 2013 Hawaii Sess. Laws. Act. 249 y Hawaii Rev. Stat. § 378-2; Illinois, Ill. Rev. Stat. ch. 820 § 260 (2001); Indiana, Ind. Code § 5-10-6-2 and § 22-2-14-2 (2008); Louisiana, 2013 La. Acts, P.A. 87; Maine, Me. Rev. Stat. Ann. tit. 26, § 604 (2009); Minnesota, Minn. Stat. § 181.939 (1998, 2014); Mississippi, Miss. Code Ann. Ch. 1 § 71-1-55 (2006); Montana, Mont. Code Ann. § 39-2-215 et seq.; New Mexico, N.M. Stat. Ann. § 28-20-2 (2007); New York, N.Y. Labor Law § 206-c (2007); North Carolina, N.C. Gen. Stat. § 14-190.9 (1993); North Dakota, N.D. Cent. Code § 23-12-17; Oklahoma, Okla. Stat. tit. 40, § 435 (2006); Oregon, Or. Rev. Stat. § 653.075, § 653.077 and § 653.256 (2007); Rhode Island, R.I. Gen. Laws § 23-13.2-1 (2003); Tennessee, Tenn. Code Ann. § 50-1-305 (1999); Texas, Tex. Health Code Ann. § 165.003 et seq.; Utah, 2012 Utah House Joint Resolution 4 (no establece una obligación, sino que exhorta a los patronos a reconocer los beneficios de la lactancia y a proveer un periodo de tiempo a sus empleadas para la extracción de leche materna); Vermont, Vt. Stat. Ann. tit. 21, § 305; Washington, Wash. Rev. Code § 43.70.640 (2001); Wyoming, Wyo. House Joint Resolution 5 (2003) (exhorta a reconocer los beneficios de la lactancia materna y elogia a los patronos que proveen acomodo a sus empleadas para lactar o extraerse leche materna); Distrito de Columbia, D.C. Code Ann. § 2-1402.81 et seq. (establece el discrimen contra una madre lactante como una modalidad de discrimen por razón de sexo, y obliga a los patronos a proveer tiempo y lugar adecuado a sus empleadas para extraerse leche materna).

[31] Convención sobre los Derechos del Niño, UNICEF – Comité Español.                                              Disponible                                              en

Este tratado internacional, el más ratificado en el mundo entero,[32] establece en su Artículo 24(2)(e), la obligación de los Estados signatarios de adoptar las medidas necesarias para que sus sociedades conozcan los principios básicos de la salud y la nutrición en los niños, incluyendo "las ventajas de la lactancia materna". Por otro lado, el Fondo de las Naciones Unidas para la Niñez (UNICEF por sus siglas en inglés) y la Organización Mundial de la Salud (WHO por sus siglas en inglés) aprobaron el 1 de agosto de 1990 la "Declaración sobre la Protección, Promoción y Apoyo a la Lactancia" (también conocida como la Declaración de Innocenti) en la ciudad de Florencia, Italia.[33] Esta declaración reconoce, como un objetivo mundial para la salud y nutrición óptima de la madre y los infantes, que todas las mujeres deben ser capaces de practicar la lactancia materna exclusiva y todos los infantes deben ser alimentados exclusivamente con leche materna desde el nacimiento hasta los 4 a 6 meses de edad.[34] La Declaración también estableció que los Estados deben "redactar legislación creativa para proteger los derechos de la lactancia materna para las

---

http://www.unicef.es/sites/www.unicef.es/files/CDN_06.pdf (última visita 8 de julio de 2015).

[32] Únicamente Estados Unidos y Somalia no han ratificado el mismo.

[33] UNICEF/WHO, Declaración de Innocenti, 1990. Disponible en http://www.who.int/about/agenda/health_development/events/innocenti_declaration_1990.pdf (última visita 8 de julio de 2015).
[34] Íd.

mujeres trabajadoras y establecer los medios para su puesta en vigor".[35]

C. La legislación aplicable en Puerto Rico

Puerto Rico, al igual que otras jurisdicciones en Estados Unidos y en el mundo, reconoce y protege el derecho de la mujer trabajadora a amamantar o extraerse leche materna en su lugar de trabajo. Si consideramos que las mujeres componen un 43% de la fuerza trabajadora del País, el impacto de la legislación en protección de la lactancia y la vigencia que tiene en la actualidad no pueden menospreciarse.[36]

La importancia de la integración de la mujer en el mundo laboral ha convertido a la lactancia materna en un asunto del cual se ha escrito mucho en el campo jurídico.[37] Se trata de un tema de gran importancia en la

---

[35] Íd. (Traducción nuestra).

[36] El 17 de marzo de 2015, el Departamento del Trabajo y Recursos Humanos de Puerto Rico publicó la encuesta anual titulada: "Empleo y Desempleo en Puerto Rico: Encuesta de Grupo Trabajador" correspondiente a Enero 2015. Disponible en http://www.trabajo.pr.gov/pdf/Estadisticas/2015/GT/gt01.pdf. (Última visita el 13 de julio de 2015). Según los datos de dicha encuesta, para el mes de enero de este año se estimó que la población puertorriqueña de 16 o más años que estaba hábil para trabajar sumaba 2,849,000 personas. De esa población hábil, un total de 1,146,000 personas componían la fuerza trabajadora en nuestra isla, de las cuales 1,022,000 tenían empleo a enero de 2015. De ese grupo, se estimó que 439,000 o 42.95% eran mujeres. Íd.

[37] Suski, E., In one place, but not another: When the Law encourages Breastfeeding in public while simultaneously discouraging it at work, 12 U.C.L.A. Women´s Law Journal 109 (2001); Christup, H.W., Litigating a Breastfeeding and Employment Case in the New Millennium, 12 Yale J.L. & Feminism, 263 (2000); Kasdan, D., Reclaiming Title VII and the PDA: Prohibiting Workplace Discrimination Against

lucha de la mujer por alcanzar la equidad en el mundo laboral.[38] Como el amamantamiento es tanto una manera de alimentar como de criar a los hijos, tradicionalmente se ha considerado como una actividad apropiada únicamente para el espacio doméstico u otros espacios privados.[39] Por esta razón, la mujer trabajadora que desea amamantar a su hijo o hija muchas veces se encuentra ante la situación injusta de tener que elegir entre trabajar y desarrollarse profesionalmente o quedarse en casa para alimentar a su recién nacido con leche materna.[40] Las políticas públicas y leyes que han adoptado distintas jurisdicciones para reconocer los beneficios de la lactancia y promover su práctica en los espacios públicos y laborales atienden, en su fondo, un problema de elemental justicia: que la mujer tenga la misma libertad que el hombre para tomar las decisiones que entienda correctas, para ella como trabajadora y para sus hijos.

La Asamblea Legislativa legisló temprano en la década pasada para proteger y regular de cierta manera la práctica del amamantamiento y extracción de leche materna

---

Breastfeeding Women, 76 N.Y.U.L. Rev. 309 (2001); Kennedy-Orozco, N., Pumping at Work: Protection from lactation discrimination in the Workplace, 71 Ohio St. L. J. 1281 (2010).

[38] Naomi Baumslag & Dai L. Michels, Milk, Money, and Madness: The Culture and Politics of Breastfeeding, Bergin & Garvey Trade, 1995, a la página 193.

[39] Íd., págs. 202-203.

[40] Suski, E., In one place, but not another, supra, pág. 113.

en el trabajo. El 16 de diciembre de 2000, la Asamblea Legislativa aprobó la Ley Núm. 427, conocida como la Ley Para reglamentar el Período de Lactancia o Extracción de Leche Materna.[41] La exposición de motivos de dicha ley reconoció expresamente la política pública establecida desde 1995 en favor de la promoción de la lactancia materna y que "[n]o existe impedimento legal que impida a la madre continuar lactando a su bebé aun después de regresar al trabajo, luego de disfrutar de su licencia de maternidad".[42] Además, quedó claramente establecido que la ley aplicaría por igual al Gobierno como patrono y a la empresa privada.[43] La Ley Núm. 427 de 2000 fue enmendada por la Ley Núm. 239 de 6 de noviembre de 2006, con el propósito de atemperar la legislación original a las necesidades verdaderas de las madres lactantes trabajadoras, y aumentar el período disponible para la extracción de leche materna a una (1) hora.[44] En la Exposición de Motivos de la nueva Ley, el legislador reconoció nuevamente los beneficios de la lactancia y el

---

[41] 29 LPRA § 478 *et seq.*, según enmendada por la Ley Núm. 239 de 2006.

[42] Exposición de Motivos, Ley Núm. 427, 2000 (Parte 3) Leyes de Puerto Rico 2948.

[43] Leyes de Puerto Rico, supra, pág. 2948. "Esta Ley reconoce la política pública de la lactancia otorgando un período de lactancia o extracción de leche materna tanto en la empresa privada como en el Gobierno, sus instrumentalidades, municipios y corporaciones públicas".

[44] Exposición de Motivos, Ley Núm. 239, 2006 Leyes de Puerto Rico 1254.

amamantamiento tanto para los infantes como para las madres.[45] La Ley Núm. 239-2006 también se refirió a los requisitos que la Ley impone respecto al lugar que los patronos deben habilitar para el proceso de extracción de leche materna:

El cuatrienio pasado se intentó infructuosamente que la Ley Núm. 427 se enmendara para que el tiempo concedido a la madre para extraer la leche o lactar a su bebé coincidiera con el período que el proyecto original contemplara. De la misma forma, se procuró que se proveyera a las madres lactantes un lugar discreto, seguro e higiénico para extraerse la leche. Nuevamente se trae el asunto a la consideración de la Asamblea Legislativa, para que la licencia de lactancia sea realmente efectiva.[46]

La legislación vigente en nuestro País establece que toda mujer trabajadora que se encuentre amamantando o lactando a su hijo o hija podrá disfrutar, luego de reintegrarse a su lugar de empleo, de un período de una (1) hora para amamantar a su recién nacido, si es que su patrono cuenta con una facilidad de cuido de infantes, o para extraerse la leche materna "en el lugar habilitado a

---

[45] Leyes de Puerto Rico, supra, pág. 1255.

[46] Leyes de Puerto Rico, supra, págs. 1255 – 1256. (Subrayado añadido).

estos efectos en su taller de trabajo".[47] Este período puede ser distribuido en dos periodos de treinta (30) minutos o tres períodos de veinte (20) minutos.[48] Esta licencia de lactancia tendrá una vigencia de doce (12) meses dentro del taller de trabajo, a partir del regreso de la empleada a sus funciones.[49] Una vez el patrono y la empleada han acordado los períodos que esta utilizará para ejercer su derecho a lactar, estos no podrán cambiarse sin el consentimiento expreso de ambas partes.[50] Si el patrono no le reconoce a la empleada su derecho a amamantar o extraerse leche materna en el lugar de trabajo, esta podrá reclamar su derecho ante los foros pertinentes. La Ley dispone que el tribunal o foro con jurisdicción podrá imponer una "multa" al patrono por los daños que sufra la empleada, la cual podrá ser igual a tres veces el sueldo devengado por esta por cada día que se le negó el período de amamantar o extracción de leche materna.[51]

Ahora bien, la Ley Núm. 427, supra, según enmendada, no especifica las condiciones que debe cumplir el lugar provisto por el patrono para facilitar la lactancia. Tan

---

[47] Art. 3, Ley Núm. 427 de 16 de diciembre de 2000 (Ley para Reglamentar el Período de Lactancia o Extracción de Leche Materna, 29 LPRA § 478a, et seq., según enmendada).

[48] Art. 3, Ley Núm. 427, supra.

[49] Art. 4, Ley Núm. 427, supra.

[50] Art. 8, Ley Núm. 427, reenumerado como Art. 7, supra.
[51] Art. 10, Ley Núm. 427, reenumerado como Art. 9, supra.

solo dispone que debe estar "habilitado" para estos efectos en particular. Sin embargo, durante el período de siete (7) años entre el año 1999 y el año 2006, la Asamblea Legislativa aprobó otras leyes para proteger y promover la lactancia materna que, al tratar sobre la misma materia, nos permiten llenar este vacío.[52] Estas son, evidentemente, leyes que se refieren a la misma materia, sobre las cuales el Código Civil de Puerto Rico dispone lo siguiente: "[l]as leyes que se refieran a la misma materia o cuyo objetivo sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro".[53] También nos instruye nuestro Código Civil que la manera más

---

[52] Entre las leyes más importantes que se aprobaron durante este período por la Asamblea Legislativa en el tema de la lactancia materna se encuentran: Ley Núm. 155 de 10 de agosto de 2002 (Establece que las agencias gubernamentales deberán proveer los recursos adecuados a las madres lactantes para que éstas puedan amamantar o extraerse leche materna en el trabajo, incluyendo proveer áreas especiales para realizar esta tarea que garanticen la privacidad, seguridad e higiene de la madre lactante); Ley Núm. 95 de 23 de abril de 2004 (Establece como práctica discriminatoria cualquier acto directo o indirecto de exclusión, distinción, restricción, segregación, limitación, denegación o cualquier otro acto o práctica en contra de una madre que esté lactando o amamantando a su recién nacido en cualquier espacio público o privado. Además, establece que no constituye un acto obsceno o exposición deshonesta el amamantar en público; tipifica como delito menos grave cualquier acto de naturaleza discriminatoria contra la madre lactante, y concede una causa de acción por daños y perjuicios a favor de la madre perjudicada); Ley Núm. 455 de 23 de septiembre de 2004 (Enmienda la Ley Núm. 155 para establecer que el lugar habilitado para que una madre lactante amamante a su hijo o se extraiga leche materna no puede coincidir con el área o espacio físico destinado al servicio sanitario).
[53] Código Civil de Puerto Rico, Art. 18. 31 LPRA § 18.

eficaz para descubrir el verdadero sentido de una ley, cuando alguna de sus disposiciones no es clara, es profundizar en las causas o motivos que indujeron a la Asamblea Legislativa a dictarla.[54]

Como ya vimos, dos años después de la aprobación de la Ley Núm. 427 de 2000, la Asamblea Legislativa aprobó la Ley Núm. 155 de 2002, supra. El Artículo 1 de dicha Ley, hace una mención expresa a la Ley Núm. 427, supra, y al exponer que "[e]sta Ley [Ley Núm. 155 de 2002] reconoce el derecho de toda madre trabajadora a lactar a su hijo, conforme a lo establecido por la Ley Núm. 427..., en un espacio físico adecuado".[55] Ese "espacio adecuado", dispone el Artículo 2 de la misma Ley, será un "área o espacio físico que garantice a la madre lactante privacidad, seguridad e higiene, sin que ello conlleve la creación o construcción de estructuras físicas u organizacionales en la agencia...".[56]

Ambas legislaciones, la Ley Núm. 427 de 2000 y la Ley Núm. 155 de 2002, supra, están íntimamente relacionadas y fueron creadas para servir un sólo propósito: reconocer los beneficios de la lactancia

---

[54] Código Civil de Puerto Rico, Art. 19. 31 LPRA § 19.

[55] Art. 1, Ley Núm. 155 de 10 de agosto de 2002 (Ley para ordenar a los Secretarios, Directores, Presidentes y Administradores públicos del ELA a designar espacios para la lactancia en las áreas de trabajo, Capítulo 19A- Reglamentar el Periodo de Lactancia o de Extracción de Leche Materna, 29 LPRA § 478 et seq., según enmendada, Disposiciones Especiales).

[56] Art. 2, Ley Núm. 155, supra.

materna y garantizar a toda mujer trabajadora el derecho de poder amamantar a su hijo o hija o extraerse leche materna en su área de empleo, ya sea su patrono público o privado. Por lo tanto, no existe ninguna duda que cuando el legislador dispuso, en el Artículo 3 de la Ley Núm. 427, que los patronos están obligados a proveerle a sus empleadas que fueran madres lactantes un lugar "habilitado" para el propósito de que pudieran extraerse leche materna, se refería a que éste lugar fuera privado, seguro e higiénico, tal y como dispone la Ley Núm. 155 en su Artículo 2. Esa es la única conclusión lógica a la que podemos llegar mediante la interpretación conjunta de ambos estatutos.[57]

D. El Derecho a la intimidad y la lactancia materna

Este Tribunal ha venido reconociendo que la maternidad, junto con las circunstancias que esta atañe y las funciones que la nueva madre realiza en la vida de su hijo o hija, entre las que podría encontrarse, si esta lo decide, la lactancia materna, disfruta de una protección

---

[57] La Asamblea Legislativa reiteró estos tres requisitos en otra ley relacionada con la lactancia materna. En la Ley Núm. 456 de 23 de septiembre de 2004, se establece que el área de lactancia y extracción de leche materna que se establezcan en los centros comerciales, puertos, aeropuertos y centros gubernamentales deberán garantizar a la madre lactante privacidad, seguridad e higiene. Además, dichas áreas no podrán coincidir con los servicios sanitarios.

jurídica especial en nuestro ordenamiento.[58] Por ejemplo, ya en el pasado hemos reconocido que el discrimen por razón de embarazo constituye una modalidad de discrimen por razón de sexo, el cual está prohibido tanto por nuestra Constitución como por leyes especiales aprobadas por nuestra Asamblea Legislativa.[59]

De igual modo, nuestra Constitución protege el derecho a la intimidad de manera precisa al establecer que "[t]oda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar".[60] En nuestro ordenamiento, este derecho se encuentra hondamente fundamentado en el valor a la dignidad del ser humano, tal y como lo dejó patentemente establecido la Convención Constituyente, al expresar en su informe que:

La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido

---

[58] Es un hecho fisiológico que la mujer es quien tiene la capacidad de amamantar o extraerse leche materna con la que alimentar a las crías de la especie humana. Por lo tanto, las ideas, las actitudes, las prácticas y los tratos que la sociedad asume o proyecta hacia la lactancia materna tienen un impacto directo en la mujer como grupo y en cada mujer como integrante del mismo. Una mujer que sea obligada a taparse mientras está amamantando a su recién nacido o a quién no se le permite extraerse leche materna está sufriendo un trato desigual por realizar una función exclusiva y característica de su sexo: producir leche materna para su hijo o hija.

[59] *Véase*, Betsy Santiago González v. Oriental Bank & Trust, 157 DPR 250, 256 (2002); Rivera Águila v. K-Mart de P.R., 123 DPR 599, 608 (1989).

[60] Art. II, Sec. 8, Const. ELA., LPRA, Tomo I, 2008, pág. 317.

en esta constitución. Se trata de la inviolabilidad personal en su forma más completa y amplia. El honor y la intimidad son valores del individuo que merecen protección cabal, no sólo frente a atentados provenientes de otros particulares, sino también contra in[j]erencias indebidas de las autoridades…[61]

Como sabemos, en nuestro ordenamiento el derecho a la intimidad opera *ex proprio vigore* entre personas privadas. El ordenamiento reconoce que cualquier ciudadano o ciudadana puede reclamar ante los tribunales el cese inmediato de cualquier violación a su derecho a la intimidad y el resarcimiento de los daños que estas conductas le puedan haber causado.[62] Así, "además del remedio interdictal, un obrero puede acudir a los tribunales para resarcir los daños sufridos como consecuencia de la lesión a sus derechos constitucionales, como lo son el derecho a la intimidad y el derecho a la protección contra ataques a la honra y a la reputación personal".[63] Incluso, de haberse materializado un despido en violación a esta norma

---

[61] 4 Diario de sesiones de la Convención Constituyente, pág. 2566, citado en José J. Álvarez González, Derecho Constitucional de Puerto Rico, TEMIS, Bogotá, 2009, a la pág. 693.

[62] Arroyo v. Rattan Specialties, Inc., 117 DPR 35 (1986).
[63] Sociedad de Gananciales v. Royal Bank de Puerto Rico, 145 DPR 178, 192 (1998). *Véase* Acevedo v. Western Digital Caribe, Inc., 140 DPR 452 (1996).

constitucional, el empleado puede obtener como remedio la reposición en su puesto de trabajo.[64]

Con relación a casos como el que tenemos hoy ante nuestra consideración, resolvemos que al tomar medidas que convierten en más onerosa la lactancia materna y/o que, de facto, tienen el efecto de impedir el que la madre obrera que decidió voluntariamente lactar a su hijo o hija pueda ejercer su derecho al amparo de la Ley Núm. 427, supra, un patrono interfiere con su derecho a tomar una decisión importante en relación a la crianza de su recién nacido. En consecuencia, incurre en una violación a su derecho a la intimidad protegido por nuestra Constitución.

Ahora bien, esta violación solo existe en aquellos casos en que la madre se ve obligada a tomar la decisión de dejar de lactar a su criatura a causa de los actos negligentes u omisiones de su patrono al incumplir con los mandatos de la Ley Núm. 4217, supra. Es menester señalar que la violación a ese derecho constitucional no ocurre de manera automática por el mero hecho de que la empleada pruebe que su patrono incumplió con la Ley Núm. 427, supra, al no proveerle un lugar privado, seguro e higiénico, o al no haberle otorgado el periodo de extracción de leche ordenado por la Ley. Será necesario que la empleada establezca un nexo entre la omisión de su

---

[64] Alberto Acevedo Colom, Legislación Protectora del Trabajo, 8va Edición, 2005, a la página 202.

patrono de proveerle un lugar adecuado y sus daños a consecuencia de verse afectada negativamente su capacidad de extraerse leche materna o tener que dejar de lactar a su criatura. Esto es, la empleada agraviada tiene que probar que su patrono incumplió con las exigencias de la Ley Núm. 427, supra, y que esa omisión tuvo el efecto directo de afectar negativamente su capacidad de lactar y/o que tuvo que dejar de alimentar a su recién nacido con leche materna. Es decir, que el incumplimiento de su patrono con la Ley tuvo la consecuencia real de anular su decisión personal de lactar al imponer condiciones tan onerosas que tuvieron el efecto directo que la madre obrera no tuviera otra opción que tomar la decisión de tener que suplementar la alimentación de su hijo con una leche distinta a la leche materna, en contra de su deseo.

Este tipo de decisiones importantes en la vida de los individuos está protegido por los contornos mínimos reconocidos por la jurisprudencia estadounidense en torno al derecho a la intimidad. Así, en Whalen v. Roe, el Tribunal Supremo federal señaló que "[t]he cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important

decisions".[65] En Puerto Rico, lo hemos reconocido anteriormente cuando establecimos que "[l]os derechos a la intimidad y a la protección contra ataques abusivos a la honra y a la reputación personal consagrados en las Secs. 1 y 8 de nuestra Carta de Derechos, supra, tienen especial preeminencia según nuestro esquema constitucional".[66] En Sociedad de Gananciales v. Royal Bank de P.R., tuvimos la oportunidad de reiterar que "un examen de nuestros previos pronunciamientos, así como de la jurisprudencia federal, revela que este derecho [a la intimidad] se lesiona, entre otras instancias, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas...".[67]

La decisión de qué alimento escoger para su recién nacido pertenece a la categoría de decisiones íntimas e importantes que una madre está completamente libre de tomar, salvo que exista un interés apremiante del Estado o de un particular, como parte de su derecho fundamental a la intimidad en su vertiente de toma de decisiones sobre la vida íntima o familiar.[68] Tal y como hemos

---

[65] Whalen v. Roe, 429 U.S. 589, 598 – 600 (1977).

[66] Sociedad de Gananciales v. Royal Bank de P.R., supra, a la pág. 201.

[67] Íd., a la pág. 202, citando a Pueblo v. Duarte Mendoza, 109 DPR 596 (1980). Véase además, Whalen v. Roe, supra.
[68] En Arroyo v. Rattan Specialties, Inc., supra, a la pág. 63, establecimos que: "En ausencia de circunstancias especiales que configuren intereses apremiantes del Estado, nuestra sociedad requiere que inclinemos la balanza en favor de la protección de los derechos del obrero a la intimidad, dignidad

señalado, como este derecho opera ex proprio vigore, sin

necesidad de que concurra el requisito de acción estatal

para invocarlo frente a personas particulares, puede

hacerse valer el mismo mediante una demanda por daños y

perjuicios al amparo del Art. 1802 de nuestro Código

Civil.[69] La empleada agraviada podrá procurar ante los

tribunales, además del remedio dispuesto en la Ley Núm.

427-2000, una compensación por los daños y perjuicios que

le ocasionaron los actos del patrono que lesionaron su

---

y a estar protegido contra riesgos para su integridad personal
en el trabajo, frente al derecho del patrono…".

[69] Artículo 1802, Código Civil de Puerto Rico, 31 LPRA § 5141.
Indica el Juez Asociado señor Martínez Torres en su Opinión
Concurrente que en este caso no se sostiene un análisis
constitucional, ya que se le puede conceder a la peticionaria
un remedio bajo el Art. 1802 del Código Civil fundado en la
violación al deber estatutario impuesto por la Ley Núm. 427-
2000, supra. Ver, Opinión Concurrente del Juez Asociado señor
Martínez Torres, págs. 1 – 2, y pág. 11. Sin embargo, esta
postura pasa por alto dos hechos medulares a la controversia
que debemos atender. El primero, y más importante, es que la
señora Siaca reclamó en su demanda, como tiene derecho a
hacerlo, que Bahía Beach violó su intimidad al interferir con
su derecho a lactar a su hija, y al exponerla a ser vista por
otros empleados mientras realizaba el proceso de extracción de
leche materna. Los daños ocasionados por la violación a este
derecho a la intimidad no están contemplados ni son
compensables mediante el mecanismo dispuesto por la Ley Núm.
427-2000, supra. El segundo hecho medular que la Opinión
Concurrente del Juez Asociado señor Martínez Torres pasa por
alto es que por la violación del derecho a extraerse leche
materna en su lugar de trabajo, el Tribunal de Primera
Instancia concedió a la peticionaria el remedio que dispone la
Ley Núm. 427-2000, a saber, la multa que impone su Art. 10,
supra. Por lo tanto, si se concediera a la peticionaria el
remedio dispuesto por la Ley Núm. 427-2000 a la vez que una
indemnización bajo el Art. 1802 de nuestro Código Civil por la
violación de ese mismo derecho estatutario, estaríamos
compensando a la peticionaria dos veces por el mismo
fundamento jurídico. Una vez concedido el remedio que dispone
la Ley Núm. 427-2000, no se puede utilizar el Art. 1802,
supra, para conceder un remedio adicional por la violación al
mismo derecho estatutario.

derecho a la intimidad. Con esto, de manera cónsona con nuestros pronunciamientos anteriores, estamos aplicando estos derechos a las circunstancias de una madre obrera que tomó la decisión, en la intimidad de su conciencia, de alimentar a su hijo o hija con leche materna.

No albergamos ninguna duda de que resulta imperativo atender el asunto constitucional en torno a la violación al derecho a la intimidad que reclamó la señora Siaca. Sugerir que entrar en este tema es "innecesario y peligroso" es, precisamente, ignorar las violaciones constitucionales a las que se ven sometidas las trabajadoras.[70] A diferencia de lo que propone el Juez Asociado señor Martínez Torres en su Opinión Concurrente, no nos parece correcto victimizar nuevamente a la señora Siaca y echarle la culpa a ella de la violación a su derecho que cometieron su patrono y compañeros de trabajo.[71] Después de todo, la señora Siaca tomó las medidas necesarias para defender su expectativa de intimidad y la autonomía de su decisión personal, primero tapando las ventanas de cristal del primer lugar asignado y luego colocando un letrero de madre lactante en la puerta del lugar donde se extraía la leche. ¿Por qué exigirle más a la mujer trabajadora para que se respete

---

[70] Opinión Concurrente del Juez Asociado señor Martínez Torres, a la página 16.

[71] *Véase*, Opinión Concurrente del Juez Asociado señor Martínez Torres, supra, página 21.

su derecho a extraerse leche en paz? ¿Por qué culparla a ella?

Por otro lado, el remedio que establece la Ley Núm. 427 - 2000, supra, no es suficiente para resarcir los daños que sufrió la peticionaria por razón de la violación a su derecho a la intimidad, los cuales probó en el Tribunal de Primera Instancia. La violación a este derecho constitucional se levanta como una causa de acción independiente y autónoma bajo la cual se justifica conceder a la señora Siaca una indemnización bajo el Art. 1802 de nuestro Código Civil, supra. No podemos perder de perspectiva que los actos de Bahía Beach configuraron una clara violación a la política pública establecida por el Estado desde el año 1995.[72] Este Tribunal ha dejado claramente establecido en su jurisprudencia que un trabajador o trabajadora tendrá derecho a un remedio en daños y perjuicios, además del remedio que provea la ley laboral, si los actos ilegales del patrono tienen el efecto de frustrar o subvertir una clara política pública.[73] Resulta errado concluir que el derecho de la señora Siaca a tomar de manera independiente una decisión de carácter personal e íntima no se violó porque Bahía Beach "nunca le prohibió extraer la leche materna en su

---

[72] Ver, pág. 18, ante, nota al calce 22.
[73] Arroyo v. Rattan Specialties, Inc., supra, pág. 66. Reiterado en SLG Pagán Renta v. Walgreens, 190 DPR 251, 260, (2014) en la nota al calce 20.

centro de trabajo".[74] Esto minimiza y disculpa la actuación ilegal e inescrupulosa del patrono que, aunque no negó de manera tajante el derecho de la peticionaria a extraerse leche materna, en la práctica anuló este derecho por las condiciones extremadamente onerosas que le impuso para poder ejercerlo, ocasionando que, eventualmente, esta tuviera que dejar de lactar. Los hechos de este caso claramente avalan la conclusión de que la señora Siaca tiene derecho al remedio provisto por el Art. 10 de la Ley Núm. 427 -2000, <u>supra</u>, y a una indemnización en daños y perjuicios bajo el Artículo 1802 de nuestro Código Civil, <u>supra</u>,[75] por la violación a su derecho a la intimidad.

III.

---

[74] Opinión Concurrente del Juez Asociado señor Martínez Torres, a la página 20.

[75] La Opinión Concurrente del Juez Asociado señor Martínez Torres propone que la "multa" establecida por la Ley Núm. 427 – 2000 no es una indemnización en favor de la trabajadora. *Véase*, Opinión Concurrente del Juez Asociado señor Martínez Torres, pág. 14 – 15. Por el contrario, que la Ley llame al remedio una "multa", no es impedimento para entender que la misma se establece a favor de la empleada. Después de todo, el nombre no hace a la cosa. Además, este Tribunal ha reiterado consistentemente que las leyes laborales deben ser interpretadas liberalmente a favor del empleado y que, las dudas sobre su interpretación deberán resolverse a favor de éste. <u>Jiménez, Hernández v. General Inst., Inc.</u>, <u>supra</u>. El Artículo 10 de la Ley, reenumerado como Artículo 9, señala claramente que dicha multa responde por los daños ocasionados a la madre lactante. De hecho, para calcular el monto de la misma **se toma en consideración el salario de la trabajadora y los daños que se le ocasionaron.** ¿Para quién sino a favor de la madre lactante sería este remedio? Así, la "multa" establecida por dicha Ley es claramente una indemnización que se paga a la empleada y que por lo tanto constituye un remedio que está concebido para compensar los daños que le ocasione la violación de su derecho estatutario.

Una vez establecido el marco legal aplicable a la reclamación de la señora Siaca contra Bahía Beach, procedemos a resolver la controversia presentada.

La señora Siaca demandó a su patrono, Bahía Beach, alegando violación a su derecho a extraerse leche materna en su lugar de trabajo, violación a su derecho a la intimidad y daños y perjuicios. Su reclamación se basó en que, luego de regresar de su licencia de maternidad, solicitó a Bahía Beach que le concediera un período de extracción de leche y un espacio adecuado para realizar esta función. Sin embargo, los espacios provistos por el patrono no eran adecuados para que la señora Siaca pudiera extraerse la leche materna. Entre otras cosas, algunos de los lugares estaban sucios y no cumplían con la higiene necesaria para la extracción de leche. Otros no proveían privacidad, al punto que en al menos dos ocasiones empleados de Bahía Beach ignoraron el letrero de madre lactante que la señora Siaca ponía en la puerta y la abrieron mientras ella estaba adentro. La señora Siaca adujo que todo esto la hacía sentir muy frustrada, enojada y deprimida, por lo que tuvo que acudir a una psiquiatra que le recetó medicamentos contra la depresión. El perito de la señora Siaca, el Dr. Ramírez Carmoega, declaró que los altos niveles de estrés que provocó esta situación en la señora Siaca provocaron que su producción de leche materna se redujera de 18 onzas

cuando se reintegró a su trabajo, a sólo 2 onzas de leche. Eventualmente, la señora Siaca tuvo que dejar de alimentar a su hija con leche materna.

El Tribunal de Primera Instancia entendió probados los hechos alegados y declaró con lugar la demanda. Concluyó que los lugares asignados por el patrono a la peticionaria se hallaban en condiciones inseguras e insalubres, llenos de cajas, archivos y otros objetos que acumulaban polvo y sucio, lo cual expuso tanto a la señora Siaca como a su hija al peligro de infecciones o el desarrollo de enfermedades y condiciones de salud. Condenó a Bahía Beach al pago de $50,000.00 por las angustias mentales y los daños ocasionados a la peticionaria más el pago de una multa igual a tres veces el sueldo de la señora Siaca por la totalidad del período de lactancia que no pudo disfrutar, según establecido por la Ley Núm. 427-2000, <u>supra</u>.[76] Finalmente, impuso a Bahía Beach el pago de las costas, y la suma $10,000.00 para el pago de honorarios de abogado.[77]

---

[76] El Tribunal de Primera Instancia no realizó una determinación sobre qué cantidad de dinero debe pagar Bahía Beach a la señora Siaca por este concepto.

[77] El Tribunal de Primera Instancia no realizó ninguna determinación de temeridad o de alguna otra circunstancia que justifique esta partida. Sin embargo, hemos establecido que dicha determinación específica no es enteramente necesaria toda vez que "en ausencia de una conclusión expresa a esos efectos, un pronunciamiento en la sentencia condenando al pago de honorarios de abogado, implica que el tribunal sentenciador consideró temeraria a la parte así condenada". *Véase*, Rivera v. Tiendas Pitusa, Inc., 148 DPR 695, 702 (1999), citando a <u>Montañez Cruz v. Metropolitan Cons. Corp.</u>, 87 DPR 38, 40 (1962).

El Tribunal de Apelaciones, por otro lado, revocó la sentencia del Tribunal de Primera Instancia. En su sentencia, el foro apelativo fundamentó su determinación en que:

La pieza legislativa a la cual nos enfrentamos sufre de vaguedad en cuanto a especificar las características con las que debe cumplir el área a habilitarse. De igual forma, las demás legislaciones referentes a este tema se han limitado a señalar que el área provista para lactar no puede coincidir con los servicios sanitarios, y que el espacio debe ser uno donde se garantice la comodidad e intimidad de la madre lactante. ... Sin embargo, no podemos concluir que esta aspiración aplique de igual forma a patronos privados que en ocasiones cuentan con un escaso número de empleados, o aquellos, como el del caso de epígrafe, que trabajan a través de proyectos en diferentes localidades y bajo diversas circunstancias.[78]

Con este razonamiento, el Tribunal de Apelaciones concluyó que la Ley Núm. 427-2000, <u>supra</u>, no obliga a los patronos de la empresa privada a crear un espacio fijo permanente para acomodar a las empleadas que desearan extraerse leche materna. Concluyó que "el propósito de la ley en cuanto a las empresas privadas es garantizar que se le provea el tiempo y cierto espacio adecuado a una madre lactante al momento que esta lo solicite".[79] No

---

[78] Apéndice, págs. 16 - 17.
[79] Apéndice, pág. 17.

obstante el testimonio de la señora Siaca y su perito, a quienes el Tribunal de Primera Instancia dio credibilidad, el foro apelativo determinó que Bahía Beach atendió diligentemente las solicitudes hechas por la peticionaria y le facilitó el tiempo y el espacio para que pudiera extraerse leche materna. Erró el Tribunal de Apelaciones al concluir de esta forma.

La Ley Núm. 427-2000, supra, es parte de nuestra legislación social protectora del empleo. A través de los años nuestra jurisprudencia ha reiterado consistentemente que las leyes laborales deben ser interpretadas liberalmente y que, de existir alguna duda sobre su interpretación, esta deberá resolverse a favor del empleado,[80] por razón de la naturaleza de este tipo de legislación como instrumento de justicia social y su carácter reparador.[81] Por eso "la exclusión de un empleado de los beneficios de la legislación laboral debe ser clara y convincente".[82] Según vimos, la Ley Núm. 427-2000 ordena claramente a los patronos privados, sin importar su tamaño o número de trabajadores, a garantizar a sus empleadas un periodo de extracción de leche igual a una (1) hora dentro de una jornada laboral de ocho (8)

---

[80] Cordero Jiménez v. U.P.R., 188 DPR 129, 139 (2013).

[81] Jiménez, Hernández v. General Inst., Inc., 170 DPR 14, 41 (2007).

[82] Cordero Jiménez v. UPR, supra, citando a López Vega v. F. Vega Otero, Inc., 103 DPR 175, 177 (1974). (Énfasis añadido).

horas.[83] Incluso, los patronos privados que sean considerados pequeños negocios por la Administración Federal de Pequeños Negocios están obligados a conceder a sus empleadas la mitad de ese tiempo, es decir, un periodo de treinta (30) minutos dentro de cada jornada laboral de ocho (8) horas.[84] Además, la Ley especifica que la extracción de leche materna se llevará a cabo en el lugar habilitado por el patrono para ese propósito lo cual significa, como ya vimos al interpretar dicho lenguaje en conjunto con el lenguaje de la Ley Núm. 155-2002, supra, que se debe proveer un espacio privado, seguro e higiénico para la madre lactante.

La obligación que impone la Ley Núm. 427-2000 aplica en su totalidad a Bahía Beach. El que esta empresa, al momento de los hechos, fuera una desarrolladora de un proyecto en vías de construcción o que sus facilidades sobre el terreno se encontraran acomodadas dentro de vagones o "trailers" no la excusaba de cumplir con las disposiciones de la Ley. Contrario al razonamiento del Tribunal de Apelaciones, ello no requiere en todo caso que el patrono cree un espacio fijo permanente para ese propósito. Los requisitos que impone la Ley Núm. 427-2000 son fáciles de cumplir si el patrono está realmente dispuesto a colaborar con su empleada para proveerle un

---

[83] 29 LPRA §478a.

[84] Íd.

espacio limpio, privado y seguro para extraerse leche materna. En este caso, eso no ocurrió.

Según encontró probado el foro de instancia, la primera oficina asignada a la señora Siaca, ubicada en el vagón donde se encontraba también la oficina de Recursos Humanos, no era privada, toda vez que las ventanas eran de cristal y no tenían cortinas. La señora Siaca debía entonces utilizar parte del tiempo que correspondía a la extracción de leche materna para cubrir las ventanas con papel y evitar así ser vista por otros compañeros de trabajo que se asomaban por la ventana para ver si había alguien dentro de la oficina. Bahía Beach podía razonablemente utilizar sus recursos para atender esta situación. Sin embargo, no hizo nada.

Luego, sin haber consultado a la señora Siaca o solicitado su consentimiento, se cambió el lugar asignado a un segundo vagón, dentro del área de construcción del Hotel St. Regis.[85] A la señora Siaca le tomaba de 7 a 8 minutos llegar a este segundo lugar utilizando un carrito de golf en un día seco. Una vez allí, el lugar asignado no era higiénico y casi todo el espacio estaba lleno de archivos y anaqueles para almacenar documentos. El área de ventilación del aire acondicionado tenía moho

---

[85] La Ley establece que una vez establecido el periodo de lactancia entre el patrono y la madre lactante, "éste no cambiará sin el consentimiento expreso de ambas partes". 29 LPRA § 478f. Tal y como señalamos, este cambio de lugar representó una reducción en el tiempo que tenía la señora Siaca para realizar la extracción de leche materna.

provocado por la humedad, lo que hacía el lugar proclive a las bacterias e infecciones además de cucarachas y otros insectos, según testificó la señora Siaca. En este lugar la señora Siaca fue interrumpida en al menos dos ocasiones por empleados que abrían la puerta utilizando otra llave, a pesar del aviso de que la habitación se estaba usando por una madre lactante. Además, el aire acondicionado de la oficina se dañó y no fue reparado prontamente. Para colmo, nuevamente sin mayor aviso, el lugar se inhabilitó para el uso de extracción de leche lo cual la señora Siaca descubrió cuando fue a utilizarlo un día y lo encontró completamente lleno de materiales de construcción.

El último lugar "habilitado" para uso por la señora Siaca fue un pequeño almacén dentro del vagón de Recursos Humanos. Este tercer lugar tenía su espacio muy comprometido también, toda vez que en el mismo había un armario con uniformes, equipo de cocina y de deportes, alfombras ya usadas, cajas de bebidas y servidores de computadoras. El lugar tampoco era higiénico pues la ventilación del aire acondicionado tenía moho causado por la humedad y caía una gotera que daba justo sobre la mesa donde la señora Siaca debía extraerse la leche materna, que era el alimento de su hija. Tampoco ofrecía la privacidad requerida pues en ese lugar la señora Siaca también fue interrumpida por un empleado, el mantenedor

de sistemas de información de la empresa, quien entró a la oficina con su llave a pesar del letrero de madre lactante.

Todos estos incidentes y las condiciones inseguras, antihigiénicas y de falta de privacidad se extendieron durante la totalidad del periodo de lactancia autorizado por Ley a la señora Siaca. De nada sirve, y ningún propósito tiene el que un patrono le provea a su empleada un periodo de tiempo para amamantar o extraerse leche materna si no le brinda para ello un espacio que sea seguro, privado e higiénico. Concluir, como hizo el foro apelativo, que el patrono satisface este criterio al proveer "cierto espacio adecuado" es convertir la Ley Núm. 427-2000 en letra muerta. Concederle a una empleada que sea madre lactante un tiempo y un espacio privado, seguro e higiénico no es una aspiración de nuestro legislador: es el mandato claro de la Ley.

El testimonio pericial del Dr. Ramírez Carmoega estableció con meridiana claridad la importancia que tiene el lugar donde la madre se extraerá la leche para luego alimentar a su hijo o hija:

Bueno, la mamá para sacarse la leche debe tener un lugar ideal para hacerlo. Debe tener su máquina de extracción, y para esto tiene que tener un lugar donde pues [sic] se debe poder lavar las manos, ... [E]xtraerse la leche es un poquito más complicado que amamantar

porque probablemente tiene ... se tiene que quitar parte de su ropa. Por lo tanto necesita un lugar privado, donde tenga privacidad y seguridad para poderse extraer leche.[86]

Las condiciones en las que Bahía Beach mantenía los lugares en los que la señora Siaca se vio obligada a extraerse su leche materna no cumplían con los requisitos mínimos impuestos por la Ley Núm. 427-2000, supra. La prueba desfilada ante el Tribunal de Primera Instancia demostró que esta situación causó gran estrés en la peticionaria lo que desencadenó en depresión y la pérdida de su producción de leche materna.[87] El patrón mostrado por Bahía Beach al negarle a la señora Siaca un lugar adecuado para la extracción de leche materna, demuestra una clara violación a la política pública establecida por la Ley Núm. 427-2000, supra.

En este caso, la señora Siaca presentó prueba testifical y pericial en torno a los daños sufridos por razón de no concedérsele un lugar adecuado para el proceso de extracción de leche como ordenaba la Ley. La

---

[86] Apéndice, págs. 444 – 445.

[87] La señora Siaca testificó sobre este extremo que: "... no me estaban dando un sitio adecuado, no me estaban tratando con la cortesía y el respeto, pues, que uno se merece como mujer. Y como empleada me sentía menospreciada ante los intentos fallidos de tratar de resolver la situación en el trabajo. Me sentía que me estaban tratando... que estaba como fracasando como madre, porque no podía lactar a la magnitud que la bebé necesitaba. ... Pero con el estrés que estaba teniendo en el trabajo no producía las cantidades que estaba produciendo [antes] para darle abasto a la nena; so, tenía que complementarla con fórmula". Apéndice, págs. 631 – 632.

prueba creída por el foro sentenciador estableció que la señora Siaca pasó por un fuerte periodo de estrés y frustración ante la situación que estaba viviendo, lo que la obligó a buscar ayuda psiquiátrica y a tomar medicamentos anti-depresivos por espacio de un año. Además, la prueba pericial incontrovertida demostró que la señora Siaca perdió su producción de leche materna una vez se reintegró a su lugar de trabajo y que esto se debió en gran medida a la situación de estrés que estaba viviendo en ese lugar. Para resarcir los daños sufridos por la peticionaria al interferir su patrono con su derecho a la extracción de leche materna, el Tribunal de Primera Instancia impuso correctamente la multa establecida por el Art. 10 de la Ley Núm. 427 – 2000, la cual dispone que el foro con jurisdicción "podrá imponer una multa al patrono que se niegue a garantizar el derecho aquí establecido por los daños que sufra la empleada".[88] Mientras, con los hechos probados ante el foro primario, la señora Siaca demostró la responsabilidad de Bahía Beach por sus daños al amparo del Art. 1802 del Código Civil,[89] _supra_, y su derecho a

---

[88] _Ver,_ nota al calce 50, pág.28, _ante_.

[89] En _Santini Rivera v. Serv. Air Inc._, 137 DPR 1, 6 (1994) establecimos lo siguiente: "Conforme a los conocidos principios de responsabilidad civil extracontractual, es un dato fundamental, no sujeto a rectificación judicial alguna, que ¨todo perjuicio, material o moral, da lugar a reparación si concurren _tres_ requisitos o elementos: primero, se establece la realidad del daño sufrido; segundo, existe un nexo causal entre el daño y la acción u omisión de otra

obtener el resarcimiento de los mismos, además de la multa que concede la Ley Núm. 427-2000, supra, como consecuencia de la interferencia directa de su patrono con su decisión personal de alimentar con leche materna a su hija al imponerle condiciones onerosas que le impidieron ejercer ese derecho y por exponerla a la humillación de ser vista y expuesta a otros empleados mientras realizaba el proceso de extracción de leche a pesar de que esta albergaba una expectativa legítima de intimidad mientras realizaba ese acto. Esto claramente resultó en una violación a su derecho a la intimidad protegido por nuestra Constitución. Erró el Tribunal de Apelaciones al descartar los testimonios de la señora Siaca y el Dr. Ramírez Carmoega y sustituir el criterio del foro sentenciador por el suyo propio en ausencia de pasión, prejuicio, parcialidad o error manifiesto.[90]

---

persona; y tercero, dicho acto u omisión es culposo o negligente¨. (Citas omitidas). Respecto a los daños, añadimos en aquella ocasión que "[d]año es todo aquel menoscabo material o moral que sufre una persona, ya en sus bienes vitales naturales, ya en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra¨. (Citas omitidas). Si bien en principio los daños intangibles, como lo son el sufrimiento, las angustias mentales y los daños emocionales, se consideran daños no patrimoniales, debido a que su valoración pecuniaria no se funda en una equivalencia matemática, no por eso dejan de ser compensables en dinero. (Citas omitidas). Después de todo, los daños morales pueden ser de tal magnitud que su importancia exceda a la de cualquier daño material sufrido".

[90] Laboy Roque v. Pérez, et als., 181 DPR 718, 744 (2011); Ramos Milano v. Walmart, 168 DPR 112, 121 (2006); Serrano Muñoz v. Hospital Español Auxilio Mutuo, 171 DPR 717, 741 (2007).

Por esta razón procede reinstalar la sentencia del Tribunal de Primera Instancia, en aquella parte que impone a Bahía Beach el pago de la suma de $50,000 para compensar los daños y perjuicios ocasionados a la señora Siaca, así como la multa establecida por el Artículo 10 de la Ley 427-2000.[91] Toda vez que el foro sentenciador no determinó el monto de dicha multa, se ordena devolver el caso al Tribunal de Primera Instancia para que se presente prueba sobre la cuantía de la misma, conforme a lo establecido en la Opinión de este Tribunal. En cuanto a la partida de $10,000.00 para el pago de honorarios de abogado que concedió el foro sentenciador, procede eliminar la misma toda vez que no se desprende de los autos del caso ante nuestra consideración un abuso de los procedimientos, temeridad o intento de dilación por parte de Bahía Beach que justifique dicha partida.[92]

IV.

Por todo lo anterior, revocamos la sentencia emitida por el Tribunal de Apelaciones, y en consecuencia reinstalamos la sentencia emitida por el Tribunal de Primera Instancia, salvo la partida de $10,000.00 para el pago de honorarios de abogado concedida a la señora Siaca. Los hechos de este caso demuestran claramente que

---

[91] 29 LPRA § 478h.

[92] Regla 44.1 (d) de Procedimiento Civil, 31 LPRA Ap. V, R. 44.1. *Véase* Colondres v. Bayrón, 114 DPR 833 (1983); Fernández Mariño v. San Juan Cement Co., Inc., 118 DPR 713 (1987).

Bahía Beach violentó su obligación legal de proveer un lugar adecuado a la señora Siaca para que pudiera extraerse leche materna, y que las consecuencias de esa omisión en la práctica violentaron su derecho a la intimidad protegido por nuestra Constitución. Al revocar la sentencia apelada, este Tribunal Supremo hace verdadera justicia a nuestras madres obreras, interpretando coherente y vigorosamente un estatuto que se legisló con el claro propósito de reconocer a las madres trabajadoras el derecho a escoger la alimentación de sus recién nacidos sin el temor de que esta decisión represente un problema para su desarrollo profesional o laboral.

Liana Fiol Matta
Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jacqueline M. Siaca

      Peticionaria

                                     Certiorari

       v.                    AC-2012-102

Bahía Beach Resort & Golf
Club, LLC; Interlink Realty,
Corp.

      Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 25 de enero de 2016.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, revocamos la sentencia emitida por el Tribunal de Apelaciones, y en consecuencia reinstalamos la sentencia emitida por el Tribunal de Primera Instancia, salvo la partida de $10,000.00 para el pago de honorarios de abogado concedida a la señora Siaca.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal. La Jueza Asociada señora Pabón Charneco emite una Opinión de Conformidad. El Juez Asociado señor Martínez Torres emitió una Opinión Concurrente, a la que se unen el Juez Asociado señor Kolthoff Caraballo y el Juez Asociado señor Rivera García. El Juez Asociado señor Feliberti Cintrón emite la siguiente expresión:

"El Juez Asociado señor Feliberti Cintrón respetuosamente disiente de la determinación tomada por una mayoría de este Tribunal, por estar conforme con la Sentencia emitida por el Tribunal de Apelaciones el 12 de septiembre de 2012 en relación a este caso".

              Aida Ileana Oquendo Graulau
           Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Jacqueline M. Siaca

    Peticionaria

          v.

Bahía Beach Resort & Golf      AC-2012-0102
Club, LLC., Interlink Realty,
Corp.

Recurridos

Opinión concurrente emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la cual se unieron los Jueces Asociados señores KOLTHOFF CARABALLO y RIVERA GARCÍA.

En San Juan, Puerto Rico, a 25 de enero de 2016.

Opino, al igual que la mayoría del Tribunal, que Bahía Beach Resort & Golf Club, LLC. (Bahía Beach), no cumplió cabalmente con su obligación de proveerle a la Sra. Jacqueline M. Siaca (peticionaria) un *lugar habilitado* para que pudiera extraerse leche materna en su taller de trabajo de acuerdo con la Ley Núm. 427-2000, 31 LPRA sec. 5141. Sin embargo, a diferencia de la Opinión del Tribunal considero que es <u>esa omisión de su deber estatutario</u> la que obliga a Bahía Beach a indemnizar a la peticionaria al amparo del Art. 1802 del Código Civil, <u>infra</u>. Ante esta realidad,

no hay que discutir derechos al amparo de la Constitución de Puerto Rico. En cambio, el Tribunal ha restringido el campo de acción de los representantes elegidos por el Pueblo. Eso hace mucho más difícil la creación y conservación de empleos en Puerto Rico, en detrimento de los mismos obreros que el Tribunal intenta proteger. Además, me preocupa la imprecisión del lenguaje usado para describir la obligación patronal de proveer un lugar habilitado a toda empleada que desee extraerse leche materna. Por eso, debemos ser precisos con el lenguaje que usemos para describir la obligación patronal de proveer un lugar habilitado a toda empleada que desee extraerse leche materna.

I.

Al momento de los hechos, Bahía Beach era un complejo de viviendas y *walk-ups* en etapa de construcción con ciertas áreas terminadas y en funcionamiento. Por su parte, la peticionaria era supervisora del Departamento de Seguridad de Bahía Beach desde noviembre de 2007. Así las cosas, a inicios de 2008, la señora Siaca quedó embarazada y, en las postrimerías de su estado de gestación, comenzó a agotar su licencia por maternidad. El 19 de diciembre de 2008, con casi un mes de anticipación, la peticionaria notificó a Bahía Beach, a través de su Oficial de Recursos Humanos, la Sra. Aixa Olavarrieta Archilla, su deseo de extraerse leche materna en su centro de trabajo.

Luego de reintegrarse a sus labores, el primer lugar que Bahía Beach le ofreció a la peticionaria para que se extrajera leche materna fue un baño, el cual la peticionaria rechazó por no considerarlo apto para esa actividad. Posteriormente, Bahía Beach le proveyó una oficina adyacente a la Oficina de Recursos Humanos ubicada en un vagón. Esa oficina tenía ventanas de cristal por las que otros empleados podían observar desde el exterior a quien estuviese adentro. Por esa razón, la peticionaria tuvo que dedicar parte de su periodo de extracción de leche a tapar las ventanas con papel. No obstante, Bahía Beach tuvo que contratar a una persona para ocupar el puesto de *Rental Manager* y necesitaba el lugar designado para el uso de la señora Siaca. Así, pues, transfirió a la peticionaria a otro vagón localizado en un área apartada que se le conocía como "la jungla", al que le tomaba entre 10 a 15 minutos llegar, tiempo que se le restaba de su periodo para extraerse leche materna.

En ese tercer lugar había un acondicionador de aire que tenía los conductos cubiertos con hongos y moho. Además, en una ocasión la peticionaria observó cucarachas y otros insectos en ese lugar. También, mientras se encontraba en ese vagón en medio del proceso de extracción de leche, tuvo que tolerar que otros empleados le abrieran la puerta a pesar de que había colgado un letrero que ella preparó y que advertía: "madre lactante – favor de no interrumpir". Del mismo modo, mientras se extraía leche

materna, la interrumpían mediante llamadas por radio para que se reportara a su área de trabajo. Asimismo, en una ocasión la peticionaria encontró ese lugar ocupado por cajas con equipo y material de construcción. Luego de reportar ese incidente, Bahía Beach designó la Casa Club del complejo para que la peticionaria se extrajera leche materna. Cabe destacar que el foro primario estimó que ese cuarto lugar cumplía con los requerimientos de la Ley Núm. 427-2000, infra. No obstante, ese lugar solo estuvo disponible para uso de la peticionaria por un fin de semana.

Por último, Bahía Beach proveyó un quinto lugar para que la peticionaria se extrajera leche materna: el cuarto de almacenamiento del vagón de la Oficina de Recursos Humanos. En ese lugar se almacenaba: un armario con uniformes de empleados, cajas con equipo de cocina, cajas con equipo deportivo, cajas con otros víveres y alfombras usadas. Allí también ubicaban los servidores de los sistemas de información del proyecto. Los conductos del acondicionador de aire que se hallaba en ese lugar también tenían hongos y moho. Además, de los conductos del acondicionador de aire surgía una gotera de agua que caía sobre la única mesa que estaba en ese cuarto y que era usada por la peticionaria en su proceso de extracción de leche materna. Al igual que le sucedió en el vagón que ubicaba en el área llamada "la jungla", otro empleado entró de improviso mientras la peticionaria se encontraba

en pleno proceso de extracción, a pesar de que ella había colgado un letrero de madre lactante frente a la puerta. Los incidentes en los cuales otros empleados entraron inesperadamente al lugar donde se encontraba la peticionaria en el proceso de extracción de leche materna fueron reportados a Bahía Beach. Sin embargo, el patrono no tomó medidas correctivas.

II.

A. La Ley Núm. 427-2000, 29 LPRA sec. 478, et seq. se aprobó a finales del 2000 como una legislación que extiende la política pública del Gobierno de Puerto Rico de promover la leche materna como el alimento principal de los infantes. Exposición de Motivos, Ley Núm. 427, supra. De esa forma, se obliga a los patronos, públicos y privados, a permitir que sus empleadas acudan al cuido de niños de su centro de trabajo para lactar a su infante o, si el centro de trabajo no tiene cuido, a proveer un *lugar habilitado* en sus talleres de trabajo para que las madres puedan extraerse leche materna. En aras de instrumentar esos derechos, la Ley Núm. 427, supra, provee para que las empleadas cuenten con una hora de su jornada laboral para realizar cualquiera de esas actividades. 29 LPRA sec. 478a. Asimismo, la Ley Núm. 427, supra, requiere el consentimiento de la empleada para que el patrono pueda modificar el horario acordado entre las partes para el ejercicio del derecho otorgado por esa ley. 29 LPRA sec. 478f. En ese sentido y en aras de cumplir con su deber,

nada en la ley impide que un patrono modifique por sí solo el *lugar habilitado* para que una empleada se extraiga leche materna, siempre y cuando no afecte el horario ni el periodo que esta dispone para el ejercicio de su derecho estatutario.

Ahora bien, la Ley Núm. 427, supra, no define el *lugar habilitado* que todo patrono ha de proveer a la empleada que lo solicite. No obstante, a través de un ejercicio de hermenéutica estatutaria según autoriza el Art. 18 del Código Civil, 31 LPRA sec. 18, es posible concluir que el lugar habilitado que debe proveerse para cumplir con la legislación debe ser **privado, seguro e higiénico**. Ese análisis adopta por analogía los mismos criterios que se le exigen al Gobierno como patrono a través de la Ley Núm. 155-2002, según enmendada, 29 LPRA sec. 478 nota, a la empresa privada. Del mismo modo, la flexibilidad que le asiste al Gobierno para proveer un lugar habilitado para que una empleada pueda extraerse leche materna también se le extiende a la empresa privada. Nótese que el Gobierno no tiene que crear o construir estructuras físicas para cumplir con las disposiciones de la Ley Núm. 427, supra. Art. 2, Ley Núm. 155, supra. Además, su obligación está supeditada a la disponibilidad de recursos. Íd.; véase además, R.E. González Ramos, Algunos comentarios respecto a la ley para reglamentar el periodo de lactancia o extracción de leche materna, 82 Rev. Jur. Dig. UPR 7, 22-23 (2013).

La Opinión del Tribunal no aborda lo más importante: esa flexibilidad para cumplir con las disposiciones de la Ley Núm. 427, supra, no es otra cosa que un estándar de razonabilidad. De hecho, el Informe de las Comisiones de Gobierno y Bienestar Social de la Cámara de Representantes sobre el P. de la C. 1034 de 2 de mayo de 2002, el proyecto de ley que se convirtió en la Ley Núm. 155, supra, y de donde se extrapolan por analogía los criterios con los que el patrono privado tiene que cumplir, dispone explícitamente que: "La medida no pretende gravar a las entidades públicas con una exigencia que exceda sus recursos y los espacios físicos con los que cuenta". Informe de las Comisiones de Gobierno y Bienestar Social de la Cámara de Representantes, pág. 3. En otras palabras, a pesar de que se reconoce la importancia del cumplimiento con el deber estatutario, el legislador fue consciente de que existen circunstancias en las que proporcionar el área habilitada que exige la Ley Núm. 427, supra, puede llegar a ser tan oneroso para el patrono que lo torne en prohibitivo.[93] Ese mismo escenario puede tener lugar, más frecuentemente, en la empresa privada. A diferencia del Gobierno de Puerto Rico y sus demás instrumentalidades que

---

[93] En esa misma línea, la *Fair Labor Standards Act of 1938*, 29 USC sec. 201, et seq., dispone que todo patrono debe proveer un lugar habilitado para que una empleada se extraiga leche materna y un periodo para el ejercicio de ese derecho en su taller de trabajo. 29 USC sec. 207 (r)(1). Sin embargo, la ley exime a todo patrono que emplee 50 empleados o menos del cumplimiento con esas disposiciones, si su observancia es demasiado onerosa ("*undue hardship*"). 29 USC sec. 207(r)(4).

funcionan en su mayoría en edificios con oficinas, no todas las empresas privadas operan dentro de las cuatro paredes de una edificación (*brick-and-mortar business*). Por eso, en su día, tendremos la oportunidad de sopesar la interacción del deber patronal que impone la Ley Núm. 427, supra, con la realidad laboral del Siglo XXI, la cual, gracias a los adelantos, en algunas instancias, ni siquiera requiere presencia física.

En resumen, considero que en un caso como este, en donde se alegue que el patrono privado no proveyó un lugar privado, seguro e higiénico para que una de sus empleadas se pudiese extraer leche materna, deberá dirimirse si el patrono llevó a cabo esfuerzos razonables para cumplir con la obligación que le impone la Ley Núm. 427, supra. Esa conclusión deberá estar basada en los hechos particulares de cada caso.

Con respecto al remedio provisto por la Ley Núm. 427, supra, la redacción original del P. de la C. 127 de 24 de enero de 1997 elaboró un esquema administrativo ante el Departamento del Trabajo y Recursos Humanos para que las madres obreras pudieran reclamarle a sus patronos el derecho establecido en esa legislación. Consecuentemente, el Art. 7 de este proyecto disponía que todo patrono que rehusara, impidiera o negara el derecho de la madre obrera a lactar a su criatura o a extraerse leche materna estaría sujeto a una multa de $500 por cada día al que se extendiesen "las consecuencias negativas de la

infracción". Además, reconocía de forma explícita, en su Art. 9, que la empleada tenía derecho a que se le pagara el equivalente de tres veces su salario, jornal o compensación correspondiente por cada día que no disfrutara de su derecho, más una suma razonable de gastos, costas y honorarios de abogado.

Por otro lado, el Sustitutivo del Senado al P. de la C. 127 de 19 de junio de 2000 no incluyó la imposición de un multa para el patrono que no proveyera "el privilegio" del periodo para que una empleada lactara a su hijo o se extrajera leche materna en su centro de trabajo. Tampoco otorgaba remedios en daños a la empleada. Este otro proyecto se aprobó en el Senado y se remitió al Comité de Conferencia junto al P. de la C. 127, _supra_.

Finalmente, se armonizaron ambos proyectos en Conferencia y surgió un lenguaje que eliminó la versión original de la multa de $500 por día y la indemnización a favor de la empleada. En su lugar, se fusionaron los Arts. 7 y 9 del P. de la C. 127, _supra_, y quedó la redacción actual del Art. 9 de la Ley Núm. 427, _supra_. Este dispone lo siguiente:

> Toda madre lactante a quien su patrono le niegue el período otorgado mediante este capítulo para lactar o extraerse la leche materna podrá acudir a los foros pertinentes para exigir [que] se le garantice su derecho. El foro con jurisdicción podrá imponer una multa al patrono que se niegue a garantizar el derecho aquí establecido por los daños que sufra la empleada y que podrá ser igual a tres veces el sueldo que devenga la empleada por cada día que se le negó el período para lactar

o extraerse la leche materna. 29 LPRA sec. 478h.

De una lectura del artículo vigente se puede colegir que el legislador optó por no limitar el foro ante el cual una madre obrera lactante puede acudir para exigir que se le garantice su derecho a lactar. De igual forma, se le concedió al foro con jurisdicción la capacidad de imponer una multa de hasta tres veces el salario o jornal de la empleada sobre el patrono infractor por cada de día que perdure la violación a las disposiciones de esa ley. En esta versión final, el legislador instauró un mecanismo de multa que se activa ante el incumplimiento con la Ley Núm. 427, supra, que, a su juicio, acarrea daños sobre la empleada lactante. Así, la última versión del remedio que otorga esa legislación demuestra la intención legislativa de incorporar un mecanismo disuasivo dirigido a evitar que las empleadas sufran daños por la negativa de su patrono a reconocerle los derechos creados por ese estatuto. Por tanto, estamos ante un esquema legislativo que busca sancionar al patrono infractor como instrumento para hacer valer los derechos de la empleada lactante pero no estatuye un remedio reparador en favor de esta.

B. En este caso, no se trata de que Bahía Beach proveyera un lugar que emulara los estándares de una sala de operaciones. Tampoco que construyera o estableciera un lugar permanente para que la peticionaria pudiese extraerse leche materna. Aunque no existe una lista

taxativa de las diligencias que Bahía Beach podía llevar a cabo, su incumplimiento con la Ley Núm. 427, <u>supra</u>, estriba en la falta de **gestiones sencillas y económicas** que pudo haber realizado y que por el contrario, rehuyó.

En torno a la oficina adyacente a la Oficina de Recursos Humanos (segundo lugar), Bahía Beach tenía a su alcance la posibilidad de <u>colocar unas cortinas</u> para obstruir la visión hacia adentro o, como hizo la peticionaria, <u>adherir papel a las ventanas</u>. Así, proveía un lugar privado. En lo que respecta al vagón ubicado en "la jungla" (tercer lugar) y el cuarto de almacenamiento en el vagón de la Oficina de Recursos Humanos (quinto lugar), Bahía Beach podía <u>limpiar</u> para evitar la acumulación excesiva de polvo e impedir la proliferación de hongos y moho en los conductos del acondicionador de aire. También podía <u>fumigar o colocar trampas contra insectos</u> en los alrededores del tercer lugar para evitar la aparición de insectos y cucarachas en el lugar designado para que la peticionaria se extrajera leche materna. Así, proveía un lugar higiénico. Además, <u>el patrono debía instruir y velar</u> porque el resto de sus empleados respetaran el horario de la madre lactante para evitar perturbaciones innecesarias. En otras palabras, Bahía Beach tenía que tomar pasos afirmativos para evitar que sus empleados abrieran la puerta del lugar donde se encontraba la peticionaria en pleno proceso de extracción de leche y no asumir una actitud pasiva cuando fue

alertado de esos incidentes. De esa forma, proveía un lugar privado y seguro.

En fin, al igual que el Gobierno, Bahía Beach no tenía que crear o construir estructuras físicas para cumplir con su obligación de proveer el lugar habilitado que le exige la Ley Núm. 427, supra. Cf. Art. 2, Ley Núm. 155, supra. No veo cómo las gestiones anteriormente descritas representan una carga tan onerosa para Bahía Beach que las tornen prohibitivas.

III.

A. En Puerto Rico, la responsabilidad civil extracontractual nace del Art. 1802 del Código Civil, supra, el cual dispone que quien "por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". Para que exista responsabilidad bajo este estatuto "es necesario: (i) que ocurra un daño; (ii) que haya una acción u omisión culposa o negligente, y (iii) que exista una relación causal entre el daño y la conducta culposa o negligente". García v. E.L.A., 163 DPR 800, 809 (2005).

Por su parte, la culpa o negligencia ha sido definida como "la falta del debido cuidado, que a la vez consiste en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias". Toro Aponte v. E.L.A., 142 DPR 464, 473 (1997) [citando a Ramos v. Carlo, 85 DPR 353, 358 (1962)]. En los casos en

que se alegue que la responsabilidad surge por una omisión, es necesario dirimir: "(1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) si de haberse realizado el acto omitido se hubiera evitado el daño". (Énfasis suprimido) Toro Aponte v. E.L.A., supra, pág. 474 [citando a Tormos v. Departamento de Instrucción Pública, 140 DPR 265, 271 (1996)]; véase, además, Elba A.B.M. v. U.P.R., 125 DPR 294, 308 (1990). Por eso, "hemos resuelto que ante una reclamación fundada en responsabilidad por omisión, la pregunta de umbral es si existía un deber jurídico de actuar de parte del alegado causante del daño". Hernández Vélez v. Televicentro, 168 DPR 803, 813 (2006).

En materia de derecho laboral, en SLG Pagán-Renta v. Walgreens, 190 DPR 251, 260 (2014), tuvimos la oportunidad de aclarar que "[c]omo regla general, ante una conducta de un patrono, prevista y sancionada por una legislación especial de índole laboral, el empleado **s[o]lo tendrá derecho al remedio que dicha ley disponga**, sin poder acudir al Art. 1802 del Código Civil". (Énfasis en original). Sin embargo, señalamos que en ese contexto el Art. 1802 del Código Civil, supra, puede constituir una fuente legal general para reclamar daños, siempre y cuando la ley laboral en consideración no lo niegue ni lo limite. SLG Pagán-Renta v. Walgreens, supra, pág. 264. Estos

pronunciamientos están enmarcados dentro del principio de evitar la doble compensación cuando una ley laboral concede al empleado una indemnización como remedio exclusivo a su agravio. Bajo este escenario, queda vedada una compensación adicional al amparo del Art. 1802 del Código Civil, supra, o cualquier otro precepto de carácter general. SLG Pagán-Renta v. Walgreens, supra, pág. 260. El mismo principio nos lleva a concluir que en la situación inversa, cuando nos encontramos ante una legislación de naturaleza laboral que proscribe y penaliza una práctica pero no incluye una compensación como remedio exclusivo para el empleado, este sí podrá acudir al ordenamiento general extracontractual para resarcir sus daños. Concluir lo contrario conllevaría dejar a los obreros sin ningún remedio cuando la legislación pertinente solo contemple vehículos estatutarios para disuadir las conductas prohibidas, como en el presente caso donde la ley permite la imposición de una multa pero no dispone una compensación como remedio para los posibles daños y perjuicios. Una multa no es un remedio compensatorio para beneficio de una empleada. Por tanto, salvo que la legislación especial lo prohíba o disponga un remedio compensatorio, aplica supletoriamente el Art. 1802 del Código Civil, supra, que contiene la regla general de indemnizar cuando se infringe un deber jurídico. Por supuesto, el empleado que acude a este remedio general

para el resarcimiento de sus daños deberá probar cada una de los elementos de su causa de acción.

B.   En este caso, Bahía Beach incumplió con su obligación estatutaria de proveer un lugar privado, seguro e higiénico para que la peticionaria pudiese extraerse leche materna. Según la prueba desfilada en juicio, esa omisión le causó unos daños a la peticionaria que pudieron haberse evitado. Estos daños se reflejaron en una disminución de su producción diaria de leche y además, provocó que la peticionaria necesitara recurrir al uso de antidepresivos. Apéndice, págs. 30-31. Así, vemos que concurren los elementos necesarios para imponer responsabilidad civil extracontractual a Bahía Beach por haber transgredido su deber legal hacia la peticionaria. Toro Aponte v. E.L.A., supra, pág. 473. Como la Ley Núm. 427, supra, es un estatuto de índole laboral que no provee una indemnización como remedio para la peticionaria, entiendo que esta puede acudir al Art. 1802 del Código Civil, supra, y a las normas sobre responsabilidad civil extracontractual para obtener una compensación por los daños que el patrono ocasionó al incumplir, culposa o negligentemente, con las obligaciones reconocidas en esta ley especial. Es por esta razón que las actuaciones que infringen las obligaciones en la Ley Núm. 427, supra, permiten una causa de acción bajo el palio del Art. 1802 del Código Civil, supra, y la posible imposición de una multa. Consecuentemente, considero que la indemnización de $50,000 que el foro

primario le otorgó a la peticionaria corresponde a una compensación al amparo del Art. 1802 del Código Civil, supra. Por eso, resulta innecesario y peligroso discutir los contornos del derecho constitucional a la intimidad al tener disponible la vía estatutaria para darle el mismo remedio a la peticionaria.

Al analizar el alcance del derecho a la intimidad dentro de nuestro esquema constitucional, hemos expresado que los intereses protegidos por este son esencialmente dos. Por un lado, se encuentra el interés individual de evitar la intromisión ilícita en la vida privada y, por el otro, la capacidad de poder tomar ciertas decisiones personales e íntimas libre de interferencia de terceros. Un examen de la jurisprudencia revela que este derecho se lesiona, por ejemplo, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas, Pueblo v. Duarte Mendoza, 109 DPR 596 (1980); Roe v. Wade, 410 US 113 (1973), cuando se hostiga a una persona mediante el uso del sistema telefónico, P.R. Tel. Co. v. Martínez, 114 DPR 328 (1983), cuando la constante presencia de una foto en los medios de comunicación representa una intromisión indebida en la vida familiar, Colón v. Romero Barceló, 112 DPR 573 (1982), o al coartar la facultad de decidir sobre el uso de anticonceptivos, Eisenstadt v. Baird, 405 US 438 (1972); Griswold v. Connecticut, 381 US 479 (1965). Así, en el pasado hemos señalado que para alegar exitosamente la violación del

derecho a la intimidad es necesario que, a la luz de la totalidad de las circunstancias, se demuestre: 1) que la persona agraviada tenía una expectativa subjetiva real de que su intimidad se respete y 2) que la sociedad considera razonable la tenencia de esa expectativa de intimidad. Acaron v. D.R.N.A., 186 DPR 564, 577 (2012); López Tristani v. Maldonado, 168 DPR 838, 852 (2006). Sin embargo, "[l]a protección constitucional no opera automáticamente. Por el contrario, se activa cuando la persona afectada tiene una expectativa razonable de intimidad sobre **el lugar** o los artículos registrados. Se trata de un estándar que proviene de la norma federal anunciada en Katz v. U.S., 389 US 347 (1969)". (Énfasis suplido) Weber Carrillo v. E.L.A., 190 DPR 688, 700-701 (2014).

La Opinión del Tribunal recurre a estos intereses para concluir categóricamente que Bahía Beach lesionó el derecho a la intimidad de la señora Siaca. No obstante, en este caso no estamos ante ninguna de las situaciones que hemos considerado como nocivas al derecho a la intimidad ni ante un caso novel que justifique la creación de una nueva norma constitucional.

En primer lugar, no cabe hablar de que en este caso Bahía Beach, como patrono de la peticionaria, lesionó el derecho de esta a tomar decisiones personales, familiares o íntimas, pues nunca le prohibió extraer la leche materna en su centro de trabajo. Más bien, el patrono reconoció la

decisión de la peticionaria y designó varios lugares para que pudiese extraerse leche. Ahora bien, a pesar de que su patrono proveyó ciertos lugares para lactar incumplió con los requisitos impuestos por la Ley Núm. 427, supra. Por consiguiente, no podemos concluir que Bahía Beach limitó o interfirió con la facultad de la señora Siaca de tomar decisiones sobre su vida privada. Simplemente violó la Ley Núm. 427, supra.

En segundo lugar, al aplicar el estándar legal apropiado, tampoco podemos concluir que estemos ante una intromisión ilícita por parte de los empleados de Bahía Beach en la intimidad de la peticionaria. En este caso, adjudicamos que la mayoría de los lugares designados por Bahía Beach para que la peticionaria se extrajera leche materna no cumplieron con las disposiciones de la Ley Núm. 427, supra. Esto es, que no fueron **privados**, seguros e higiénicos. Es decir, Bahía Beach no proveyó en ciertas instancias lugares en los que, objetivamente, la peticionaria hubiese albergado una expectativa razonable de intimidad.

Los lugares que Bahía Beach designó para que la peticionaria se extrajera leche materna eran vagones que servían, en esos momentos, de oficinas administrativas y cuartos de almacén y servidores. En otras palabras, previo a que Bahía Beach designara esos lugares para el uso de la peticionaria, estos eran frecuentados por empleados del patrono para realizar actividades relacionadas a su

trabajo. Eso lo sabía la peticionaria, pues se le informó que los lugares provistos eran de manera temporera en lo que se formulaba una solución permanente. Además, no surge del expediente que las intromisiones que la señora Siaca tuvo que tolerar mientras se extraía leche materna sucedieran de forma caprichosa. Todo lo contrario. La prueba vertida en juicio demuestra que los empleados <u>siempre</u> realizaban alguna labor relacionada a su trabajo. Igualmente, quienes la perturbaron mientras ejercitaba su derecho estatutario poseían copias de las llaves de los vagones. Es decir, la peticionaria nunca ostentó la facultad de excluir a terceros de los lugares seleccionados para extraerse leche materna. En ese sentido, la colocación de un letrero, por sí solo, no es suficiente para establecer la existencia de esa expectativa <u>objetiva</u> de intimidad. Por eso, tras considerar las circunstancias particulares de este caso, opino que la peticionaria no albergó una expectativa objetiva de intimidad, pues precisamente Bahía Beach no cumplió con su obligación legal de proveer un lugar verdaderamente <u>privado</u> para que la peticionaria se extrajera leche materna.

En vista de lo anterior, una violación a cualquier expectativa subjetiva de intimidad que hubiese tenido la peticionaria es realmente, en esencia, una infracción a los deberes jurídicos impuestos por la Ley Núm. 427,

supra, y es por esa omisión que, precisamente, Bahía Beach responde bajo el Art. 1802 del Código Civil, supra.

Todo ese análisis constitucional en la Opinión del Tribunal es peligroso e incorrecto. Además, es totalmente innecesario ante la presencia de leyes que atienden el problema y además, proveen los criterios y la autoridad para indemnizar a la empleada peticionaria. En ese sentido, las normas de autolimitación judicial nos dictan que "[c]uando se puede resolver un asunto mediante un análisis estatutario, se hace innecesario considerar el aspecto constitucional". P.P.D. v. Admor. Gen. Elecciones, 111 DPR 199, 243 n.32 (1981) [citando a Pacheco v. Srio. Instrucción Pública, 108 DPR 592, 601 (1979)]. Así, aunque nos sintamos seducidos a realizar un pronunciamiento, primero debemos auscultar si este es realmente **necesario** para disponer del caso ante nuestra consideración. Véanse: Watchtower Bible v. Mun. Dorado I, 192 DPR 73, 115 (2014) (Op. Disidente, Martínez Torres, J.); Weber Carrillo v. E.L.A., supra, págs. 717-718 (Op. Disidente, Martínez Torres, J.); Pueblo v. Muñoz Santiago, 131 DPR 965, 991-992 (1992); E.L.A. v. Aguayo, 80 DPR 552, 596 (1958). No se trata de una metodología adjudicativa caprichosa, sino de evitar pronunciamientos constitucionales prematuros y a destiempo.[94] Este proceder solo representa un "mínimo de

---

[94] Adviértase que ya este Tribunal se ha tenido que enfrentar a las consecuencias de pronunciamientos constitucionales desacertados y a destiempo por no ceñirse a las normas de adjudicación adecuadas. José Julián

condiciones para el ejercicio discreto y tolerable de un poder que de otro modo constituiría una clara amenaza para la calidad democrática de [nuestro] sistema y convertiría a los jueces en guardianes de la comunidad". E.L.A. v. Aguayo, supra, pág. 597.

La metodología adjudicativa que utiliza la mayoría del Tribunal inserta más incertidumbre para atraer y promover la inversión económica y creación de empleos, pues la razonabilidad de las regulaciones sobre el sector privado queda permanentemente subyugada a la visión y preferencia que ostenten los miembros de este Tribunal. No hay duda de que el derecho de las madres a lactar es un objetivo importante y loable. Sin embargo, las consecuencias de la Opinión que se emite hoy trascienden el derecho a lactar en el ámbito obrero-patronal. Si seguimos la misma línea de pensamiento, solo es cuestión de tiempo para que surjan las siguientes interrogantes: ¿Se limita el raciocinio de la Opinión del Tribunal únicamente a la relación obrero-patronal o se extiende a cualquier persona que solicite proteger su derecho a lactar privadamente? Recordemos que el derecho a la intimidad opera *ex proprio vigore* y es uno oponible a personas privadas? ¿Es inconstitucional la Ley Núm. 95-2004, 24 LPRA 3518 et seq., en cuanto permite lactar en lugares de acomodo **público** pero no le asegura a

---

Álvarez González, Análisis del Término 2003-2004: Derecho Constitucional, 74 Rev. Jur. UPR 597, 615-616 (2005) [donde comenta las ramificaciones que tuvieron los fundamentos constitucionales utilizados para resolver Amy v. Adm. Deporte Hípico, 116 DPR 414 (1985)].

la madre lactante que así lo desee un lugar **privado** dentro del establecimiento? ¿Deben todos los establecimientos comerciales tener disponible un lugar privado para que sus clientes y visitantes lacten, no porque lo exija la Ley Núm. 168 de 4 de mayo de 1949, según enmendada, 23 LPRA sec. 43-1, sino por exigencia constitucional? Si la Asamblea Legislativa modifica las exigencias de esas leyes, ¿permanecerá inalterable el requisito de que el lugar debe ser privado, como un deber constitucional?

IV.

En conclusión, estoy de acuerdo con que Bahía Beach incumplió con su deber estatutario de proveer un lugar privado, seguro e higiénico para que la peticionaria pudiese extraerse leche materna en su centro de trabajo. Es por esa omisión de su deber estatutario que Bahía Beach debe indemnizar a la peticionaria bajo el Art. 1802 del Código Civil, supra. Por eso, es indebido hablar aquí de soluciones constitucionales. Por último, a tenor con el Art. 9 de la Ley Núm. 427, 29 LPRA sec. 428h, y según se dispone en la sentencia que hoy reinstalamos, Bahía Beach deberá satisfacer una multa que el Tribunal de Primera Instancia, Sala Superior de Bayamón, deberá calcular.

Por todo lo anterior, con mucho respeto y sin personalismos, concurro con el dictamen del Tribunal.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Jacqueline M. Siaca<br><br>    Peticionaria<br><br>        v.<br><br>Bahía Beach Resort & Golf Club, LLC., Interlink Realty,Corp.<br><br>    Recurridos | AC-2012-102 | *Certiorari* |

Opinión de conformidad emitida por la Jueza Asociada señora Pabón Charneco.

En San Juan, Puerto Rico, a 25 de enero de 2016.

Razones que transcienden el papel y la tinta me llevan a emitir un voto de conformidad en la Opinión que antecede. A estas alturas del Siglo XXI es difícil creer que aún quede un largo camino que allanar para lograr una igualdad genuina para la mujer trabajadora en los talleres laborales de Puerto Rico; una igualdad que no dependa de la discreción de un patrono de decidir si cumple o no con los estatutos que se han aprobado para proteger a la mujer de desigualdades en el ámbito laboral. Estas desigualdades arcaicas, sencillamente no se justifican en esta etapa de nuestro desarrollo social democrático.

A estas alturas de nuestro desarrollo como sociedad confieso que me estremece la realidad que trajo esta controversia ante nuestra consideración. Es lamentable que en este momento de nuestra historia una mujer trabajadora se encuentre en la injusta encrucijada de escoger entre su

empleo y tomar la decisión de amamantar o extraerse leche materna como método de alimentación para su infante. Máxime cuando hace más de una década existe un estatuto cuya política pública es precisamente evitar ese lamentable escenario. Como mujer trabajadora que ha vivido parte de las vicisitudes de la lucha en busca de una integración equitativa de la mujer en el mundo laboral, estaría faltando a mi conciencia si dejo pasar a los anaqueles de la historia la oportunidad de expresarme por separado en cuanto a la controversia que hoy atendemos. Además, me es imperativo atender algunas de las lamentables expresiones contenidas en la Opinión Concurrente emitida por el Juez Asociado señor Martínez Torres.

I

Lamentablemente, en la época que crié a mis tres (3) hijos no existía una protección legal para aquellas mujeres trabajadoras que decidieran amamantar o extraerse leche materna al reintegrarse a su lugar de empleo luego de disfrutar su licencia de maternidad. No obstante, a pesar de que personalmente no pude disfrutar del beneficio de ejercer ese derecho, hace ya más de una década que en Puerto Rico se promulgó legislación para proteger y reconocerles derechos a las madres lactantes en el ámbito laboral. A esos efectos, la Ley Núm. 427 de 16 de diciembre de 2000, según enmendada, conocida como *Ley para Reglamentar el Período de Lactancia o Extracción de Leche Materna*, 29 LPRA sec. 478 *et seq.* le impone a todo patrono

– público o privado – varias obligaciones. Específicamente, la Ley Núm. 427, *supra,* le impone la obligación a los patronos en Puerto Rico a que dentro de la jornada laboral de la empleada lactante provean un periodo de una (1) hora de amamantamiento, si este cuenta con una facilidad de cuido de infantes, o para la extracción de leche en el lugar habilitado en su taller laboral para esos efectos. *Inter alia,* la ley dispone cómo podrá distribuirse ese periodo. Además, especifica que la licencia de lactancia tendrá una vigencia de un (1) año contado a partir del momento en que la empleada lactante se reincorpore a su lugar de empleo. Arts. 3 y 4, Ley Núm. 427, *supra.*

Como muy bien se discute en la Opinión que antecede, a pesar de que la Ley Núm. 427, *supra,* no detalla de manera taxativa qué condiciones o características específicas debe cumplir el lugar que un patrono está obligado a habilitar para el proceso de extracción de leche materna, el principio *in pari materia* recogido en el Art. 18 de nuestro Código Civil[95] nos permite analizar otra legislación en este campo en aras de llenar ese vacío jurídico en el estatuto. El resultado de ese análisis

---

[95] El Artículo 18 del Código Civil dispone que: "[l]as leyes que se refieran a la misma materia o cuyo objetivo sea el mismo, deben ser interpretadas refiriendo las unas a las otras, por cuanto lo que es claro en uno de sus preceptos pueda ser tomado para explicar lo que resulte dudoso en otro". 31 LPRA sec. 18.

comparativo de estatutos análogos[96] no puede llevarnos a otra determinación que no sea concluir que cuándo el Art. 3 de la Ley Núm. 427, *supra,* alude a "lugar habilitado" se refiere a un lugar que como mínimo sea: **privado**, **seguro e higiénico**.

De hecho, precisa señalar que en la última enmienda que se realizó a la Ley Núm. 427, *supra,* en el año 2006 a los fines de aumentar a una (1) hora el periodo para la extracción de leche, el legislador se expresó en cuanto a las características que debía tener el lugar que los patronos deben habilitar para esos efectos. En aquella ocasión el legislador se refirió a "un lugar discreto, seguro e higiénico". Exposición de Motivos, Ley Núm. 239, 2006 Leyes de Puerto Rico 1254, págs. 1255-1256.[97]

Razones elementales nos impiden sostener otro significado para la frase "lugar habilitado" contenida en

---

[96] Véase, por ejemplo, Ley Núm. 155 de 10 de agosto de 2002, 29 LPRA sección 478 *et seq.*

[97] Por otro lado, es menester resaltar que el 13 de agosto de 2015 se presentó en el Senado de Puerto Rico el P. del S. 1451. *Inter alia,* el Proyecto propone una enmienda al Artículo 3 de la Ley Núm. 427 de 16 de diciembre de 2000, según enmendada, conocida como *Ley para Reglamentar el Período de Lactancia o Extracción de Leche Materna*, 29 LPRA sec. 478 *et seq.,* para disponer que el espacio destinado para la lactancia o el proceso de extracción de leche materna debe cumplir con los tres (3) criterios mínimos reconocidos en esta Opinión, a saber: privacidad, seguridad e higiene. En cuanto a este particular La Exposición de Motivos del referido Proyecto dispone lo siguiente:

> […] para que no quede duda y no exista espacio para controversia sobre el tema, ni necesitar recurrir a analogías al momento de interpretar la ley, es menester de esta Asamblea Legislativa incluir los criterios antes discutidos de manera explícita e inequívoca en la Ley 427, *supra,* para el conocimiento tanto de madres lactantes como de los patronos. P. del S. 1451, pág. 4.

De lo anterior podemos colegir que la actual Asamblea Legislativa está considerando un proyecto de ley que expresamente reconoce los criterios avalados en la Opinión que antecede y que están recogidos en otra legislación relacionada a esta materia.

el Artículo 3 de la Ley Núm. 427, *supra.* Cualquier interpretación contraria socavaría de raíz la política pública que este importante estatuto quiere salvaguardar. ¿De qué vale otorgar un periodo para la extracción de leche materna sino se le provee a la madre lactante un lugar **verdaderamente adecuado** para esos fines? Ambas cosas son interdependientes. Por esa razón, el legislador obligó al patrono a cumplir con **ambas.** Lo contrario tendría el resultado directo de minar la efectividad de la ley convirtiendo el estatuto en letra muerta a la merced del arbitrio de un patrono. Avalar que es suficiente con otorgar un periodo para la extracción de leche materna sin que se provea un lugar verdaderamente adecuado para esos efectos sería darle al patrono una defensa que no representa más que un subterfugio para incumplir con el mandato claro de la Ley Núm. 427, *supra.* Ello tendría el efecto directo de convertir la decisión de la madre obrera de lactar en una decisión exclusiva del patrono, dándole poder para vetar - con sus omisiones- la decisión de una madre de continuar lactando al reintegrarse a su lugar de empleo. Demás está decir que esa no es la política pública que la Asamblea Legislativa quiso adelantar con la aprobación de la Ley Núm. 427, *supra.*

II

Los hechos de este caso demuestran el patente y consistente incumplimiento por parte de la empresa Bahía Beach Resort & Golf Club, LLC. (Bahía Beach o patrono recurrido) con la Ley Núm. 427, *supra.* Los lugares

"habilitados" por Bahía Beach para fines de que la señora Jacqueline M. Siaca (señora Siaca o peticionaria) pudiera extraerse leche materna lejos de ser adecuados para esos fines, representaban más un pretexto de cumplimiento con la ley por parte del patrono recurrido. *A pesar de contar con un lugar adecuado que se encontraba finalizado y en condiciones para operar*, Bahía Beach optó por recurrir a la constante reubicación de la señora Siaca a lugares que sencillamente no eran aptos para llevar a cabo el proceso de extracción de leche materna.[98]

No hay que forzar mucho el intelecto para concluir que un baño, una oficina sin privacidad, con ventanas de cristal – sin cortinas-, un vagón en medio de un área de construcción a quince (15) minutos aproximadamente del área donde la madre lactante normalmente realiza sus laborales, un cuarto de archivos ocupado casi en su totalidad por anaqueles - con humedad y moho - o un cuarto de almacenamiento pequeño con una gotera de agua debido a una filtración justo arriba del espacio disponible para sentarse, no son lugares idóneos para que una madre lactante realice el acto delicado de extraerse leche materna de sus senos. No obstante, estos fueron los

---

[98] Surge de los autos que al momento de los hechos Bahía Beach se encontraba en construcción. No obstante, la zona residencial, el área de los "walk-ups" conocida como "Las Verandas" y la casa club se encontraban finalizadas y en condiciones para operar. La señora Jacqueline M. Siaca fue asignada a la casa club para llevar a cabo el proceso de extracción de leche. No obstante, ese espacio estuvo disponible por un fin de semana únicamente.

lugares que Bahía Beach "habilitó" para que la señora Siaca realizara este proceso. *Res ipsa loquitur.*

Según consta en autos, en uno de los lugares "habilitados" por su patrono la señora Siaca tenía que ocupar parte del tiempo que por ley le correspondía para extraerse leche materna **para tapar con papel las ventanas de cristal que la exponían al público para así garantizar su privacidad.** Además, para llegar a uno de los muchos lugares que el patrono querellado le "habilitó" tenía que montarse en un carrito de golf y atravesar un camino sin pavimentar. El tiempo que le tomaba llegar a ese lugar – aproximadamente quince (15) minutos - también se le restaba del periodo de extracción de leche que exige la Ley. Como si ello fuera poco, durante ese periodo la llamaban por radio o por teléfono para que esta se reportara a su área de trabajo y **en más de una ocasión fue interrumpida por personal mientras se encontraba en pleno proceso de extraerse leche materna con partes de su cuerpo al descubierto.** Sin duda, todo lo anterior evidencia de manera contundente la falta de idoneidad de estos lugares para que la señora Siaca pudiera extraerse leche materna y, por consiguiente, el incumplimiento de Bahía Beach con los mandatos de la Ley Núm. 427, *supra.*

La omisión de Bahía Beach de proveerle a la señora Jaqueline M. Siaca un lugar adecuado para que esta pudiera extraerse leche materna durante su jornada laboral tuvo en su persona repercusiones tanto emocionales como físicas. Quedó demostrado mediante prueba pericial que la

frustración y altos niveles de estrés que toda esta situación le provocó a la señora Siaca tuvieron el efecto directo de causar una reducción drástica en su producción de leche materna. Naturalmente, esta se deprimió y tuvo que recibir ayuda psiquiátrica para lidiar con la situación provocada por la omisión del patrono recurrido. Eventualmente, la señora Siaca no tuvo otra opción que dejar de alimentar a su hija con leche materna debido a que la reducción en su producción de leche resultaba insuficiente para alimentarla adecuadamente.

Todo esto quedó probado a satisfacción del Tribunal de Primera Instancia y en base a la prueba testimonial que le mereció entera credibilidad, ese foro determinó –correctamente– que los lugares provistos por el patrono querellado no eran adecuados para llevar a cabo el proceso de extracción de leche protegido por la Ley Núm. 427, *supra*.

III

A.

Según intimado, el Juez Asociado señor Martínez Torres lamentablemente no me ha dejado otra alternativa que expresarme en cuanto al análisis utilizado por este en su Opinión Concurrente, en la cual concluye que las actuaciones de Bahía Beach en el caso particular de autos no violaron el derecho a la intimidad de la señora Siaca.

Es norma conocida que el derecho a la intimidad en nuestro ordenamiento está protegido por nuestra Carta Magna. Véase, Art. II, secs. 1 y 8 Const. ELA, LPRA, Tomo

1, ed. 2008. En nuestro esquema constitucional la primacía de ese derecho es de tal envergadura que hemos reconocido que su invocación opera *ex proprio vigore* entre particulares. *Lozada Tirado et al. v. Testigos Jehová*, 177 D.P.R. 893, 910 (2010). Es decir, no es imprescindible una acción estatal para poder invocar esa protección constitucional legítimamente. *Íd.* No obstante, su primacía constitucional no es sinónimo de un derecho constitucional absoluto. *López Tristani v. Maldonado*, 168 D.P.R. 838, 851-852 (2006).

A su vez, hemos reconocido que el derecho a la intimidad que consagra nuestra *lex superior* tiene varias vertientes. Por un lado, "el Derecho a la Intimidad protege a las personas en la toma de decisiones personales, familiares e íntimas". *AAR, Ex Parte,* 187 D.P.R. 835, 878 (2013). Estas incluyen, *inter alia,* el derecho a terminar un embarazo, *Pueblo v. Duarte*, 109 D.P.R. 596 (1980), el derecho a negarse a recibir un tratamiento médico en particular, *Lozada Tirado et al. v. Testigos Jehová*, *supra,* 893, y el derecho a utilizar métodos anticonceptivos. *Eisenstad v. Baird*, 405 U.S. 438 (1965). Por otro lado, existe una vertiente del derecho a la intimidad que protege a la persona en sí misma como ser humano. Así, por ejemplo, no se permite la intromisión en el cuerpo de un ser humano mediante pruebas forzadas de sangre, *Missouri v. McNeely*, 133 S.Ct. 1552, 569 U.S. \_\_\_\_ (2013), ni la intromisión con la imagen propia de una persona, *López Tristani v. Maldonado*, *supra.*

Por vía de una explicación escueta, en su Opinión Concurrente el Juez Asociado señor Martínez Torres categóricamente concluye que bajo los hechos particulares del caso de autos las actuaciones de Bahía Beach no tuvieron el efecto de interferir directamente con la decisión personal de la señora Siaca de alimentar a su hija con leche materna. Para el Juez Asociado señor Martínez Torres el mero hecho de que Bahía Beach nunca le "prohibió" a la peticionaria extraerse leche materna, sino que únicamente le proveyó lugares inadecuados para esos efectos, es suficiente para concluir que Bahía Beach no "limitó o interfirió con la facultad de la señora Siaca de tomar decisiones sobre su vida privada". Op. Concurrente Juez Martínez Torres, pág. 20. Consecuentemente, entiende que el incumplimiento de Bahía Beach con la Ley Núm. 427, *supra,* no resultó en una violación al derecho a la intimidad de la peticionaria, pues esa omisión no limitó o interfirió con el derecho de esta de tomar decisiones personales, familiares o íntimas. Difiero de este análisis miope.

Si bien es cierto que Bahía Beach en ningún momento le prohibió tajantemente a la señora Siaca a que se extrajera leche materna, no condicionó su permanencia en su empleo a que esta tomara la decisión de no lactar a su hija, ni la despidió por haber tomado la decisión de ser una madre lactante, los hechos particulares de este caso -unidos a la prueba vertida en el foro primario- me obligan a concluir que la omisión de Bahía Beach fue una intromisión

*de facto* con la decisión de la peticionaria de continuar lactando a su hija luego de reintegrarse a su lugar de empleo. Me explico.

Según hemos discutido, quedó demostrado mediante prueba pericial que la omisión de Bahía Beach de cumplir con su deber estatutario de proveerle *un lugar adecuado* a la peticionaria para que esta pudiera extraerse leche materna tuvieron el efecto **directo** de causar una reducción drástica en su producción de leche materna. Según la prueba pericial que le mereció entera credibilidad al foro sentenciador, esa reducción estaba íntimamente correlacionada a la frustración y los altos niveles de estrés que la omisión del patrono recurrido de proveerle un lugar adecuado para la extracción de leche provocó en la peticionaria. Como resultado de lo anterior, la señora Siaca se vio obligada a dejar de alimentar a su hija con leche materna debido a que la reducción en su producción de leche resultaba insuficiente para alimentarla adecuadamente.

Bajo los hechos particulares de este caso es forzoso concluir que la omisión de Bahía Beach de proveer un lugar adecuado fue de tal magnitud que *de facto* tuvo el efecto de inmiscuirse en la decisión personalísima de la señora Siaca de extraerse leche materna para alimentar a su hija. Ello pues no proveerle el lugar adecuado a la peticionaria para el proceso de extracción convirtió ese acto en algo tan oneroso que como resultado se redujo su producción y esta no tuvo otra opción que dejar de alimentar a su hija

con lecha materna. No porque necesariamente y voluntariamente así lo quiso o decidió, sino porque fisiológicamente no le quedó otra opción. Con sus actos Bahía Beach usurpó la decisión de la señora Siaca a lactar; su omisión y su negligencia la obligaron a tomar esa decisión y, por lo tanto, limitó e interfirió directamente con la facultad de la peticionaria de tomar la decisión personalísima de lactar a su hija.

Contrario a lo que intima el Juez Asociado señor Martínez Torres, en la Opinión que antecede no se pauta que la omisión y negligencia de Bahía Beach de proveer un lugar privado, seguro e higiénico, automáticamente se traduce a una prohibición absoluta por parte de un patrono a que una madre tome la decisión personalísima de lactar. Es decir, la Opinión que antecede no establece que, si un patrono viola la Ley Núm. 427, *supra,* este **automáticamente** viola el derecho a la intimidad de la empleada por el mero hecho de no proveerle un lugar privado, seguro e higiénico. Sino que, como muy bien se discute en la Opinión que antecede, para que esa violación constitucional ocurra será necesario que la empleada agraviada pruebe los siguientes elementos, a saber: (1) que su patrono incumplió con las exigencias de la Ley Núm. 427, *supra,* al no proveerle un lugar privado, seguro e higiénico para extraerse leche materna, y (2) que esa omisión del patrono le causó daños al tener el efecto directo (nexo causal) de provocar que esta tuviera que dejar de amamantar a su hijo con leche materna. Ello se

probó en el caso de autos. Por supuesto, el análisis anteriormente descrito dependerá de las particularidades de cada caso.

B.

Ahora bien, si cortas de vista son las expresiones del Juez Asociado señor Martínez Torres con relación al derecho a la intimidad en la vertiente discutida en el acápite anterior, lo expresado por este en cuanto a la expectativa de intimidad de una madre lactante es, francamente, pasmoso y perturbador.

Pintando con brocha fina los hechos del caso de autos, el Juez Asociado señor Martínez Torres expresa categóricamente que la peticionaria no tenía una expectativa de intimidad al momento de extraerse leche materna en su lugar de empleo. Vehementemente, difiero.

No albergo duda que en este caso hubo una violación al derecho a la intimidad de la señora Siaca. Esta violación se concretizó en las dos (2) instancias que los empleados de Bahía Beach ignoraron el letrero de "Madre Lactante – Favor No Interrumpir" colocado por la peticionaria y entraron mientras esta se encontraba en pleno proceso de extracción de leche con parte de su cuerpo al descubierto. Estas instancias fueron notificadas a Bahía Beach, no obstante, este optó por asumir una actitud pasiva y nada hizo al respecto. Las actuaciones de los empleados de Bahía Beach – quienes son sus agentes – laceraron la **intimidad** de la peticionaria al interrumpirla en un momento **íntimo** y en un lugar donde ella albergaba, **<u>sin</u>**

**lugar a dudas**, una expectativa legítima de intimidad. Las actuaciones de Bahía Beach expusieron a la señora Siaca a que otros empleados la vieran mientras realizaba el proceso de extracción de leche materna, lo cual la peticionaria alegó y probó le ocasionó daños. Nuestros pronunciamientos en ese tema apoyan esta conclusión.

Es norma reiterada que la expectativa de intimidad de un ciudadano se determina utilizando un estándar de dos elementos; uno objetivo y otro subjetivo. Estos elementos son: (1) que el individuo, dentro de las circunstancias de su caso, tenga una expectativa real de que su intimidad será respetada (criterio subjetivo), y (2) que la sociedad está dispuesta a reconocer esa expectativa subjetiva como como una legítima y razonable (criterio objetivo). *Véase*, *Vega v. Telefónica*, 156 D.P.R. 584 (2002). Este estándar se utiliza ya sea en el ámbito civil, criminal o administrativo. *Id*.

Según intimado, no hay que forzar mucho el intelecto para concluir que una madre lactante -y en particular la peticionaria de autos- alberga una expectativa de intimidad al momento de extraer su leche materna o lactar a su hijo. Es evidente que la peticionaria de autos cumple con el criterio *subjetivo* ya que no hay duda alguna que esperaba que su privacidad fuera respetada al momento de extraerse leche materna en su lugar de empleo. Esa expectativa era de tal magnitud que la señora Siaca tomó medidas afirmativas para asegurase que la misma se respetara. A esos efectos, colocaba letreros en las

puertas en los cuales **exigía y reclamaba** privacidad, **cerraba la puerta con seguro**, **tapaba con papel las ventanas de esos lugares para evitar ser vista por el público**, todo para realizar el tan íntimo y eminentemente femenino acto de exponer sus senos para extraer el alimento para su bebé. Es absolutamente increíble que en este Siglo una persona concluya que la peticionaria de autos-y cualquier madre lactante en una posición similar – no cumpla al menos con el criterio **subjetivo** de expectativa de intimidad.[99]

Pero, según mencionado, para que su expectativa esté constitucionalmente protegida, la madre lactante debe cumplir también con el criterio **objetivo** en cuanto a que

---

[99] En ese sentido, el Juez Asociado señor Martínez Torres expresa que la peticionaria de autos no tenía expectativa [subjetiva] de intimidad ya que, *inter alia,* había empleados del patrono que tenían llaves para entrar al lugar que se le proveyó para extraer su leche materna. Sin embargo, los empleados tenían llaves y acceso al lugar en el cual se encontraba la peticionaria mientras se extraía leche **precisamente** por las omisiones del patrono al no cumplir con los requisitos de la Ley Núm. 427, *supra,* de proveerle un lugar **privado**. Es inconcebible que se le impute a la señora Siaca el conocimiento de que no estaba en un lugar privado, a pesar de todas las acciones que **ella** *motu proprio* llevó a cabo, porque su patrono falló en proveerle un lugar privado. Ese argumento patentemente circular es decir que la peticionaria "debió saber que el lugar no era privado, porque el patrono faltó a su deber de proveerle un lugar privado." Además de considerar que el Juez Asociado señor Martínez Torres entremezcla incorrectamente los conceptos de aquello que es subjetivo y objetivo para efectos de determinar si una persona alberga una exceptiva legítima de intimidad, me parece paradójico concluir que la peticionaria no albergaba una expectativa <u>subjetiva</u> de intimidad por la omisión de su patrono de proveerle un lugar privado. **Su expectativa subjetiva de intimidad la crea ella de manera personalísima, no su patrono mediante una omisión.**

la sociedad está dispuesta a reconocer esa expectativa como legítima y razonable. Francamente, pensaba que no había dudas en cuanto a que la sociedad contemporánea ya había reconocido la intimidad y privacidad que para algunas mujeres conlleva el acto de lactar o extraerse leche materna. De hecho, de las pocas controversias en cuanto a la expectativa de intimidad en las que ese debate parecía estar superado, era en cuanto a la aceptación social del carácter íntimo que conlleva ese acto. Pero, como vimos, para el Juez Asociado señor Martínez Torres es **ilegítimo** e **irrazonable** que la sociedad objetivamente reconozca esa realidad. Como mínimo, tengo que reconocer la audacia que ha tenido el Juez Asociado señor Martínez Torres para expresar esa conclusión en una Opinión que habrá de publicarse y que quedará indeleble en la historia de este Tribunal.

Superado ese análisis, nos corresponde contestar la siguiente interrogante: ¿Ha reconocido **objetivamente** la sociedad el derecho a la intimidad y privacidad que conlleva el acto de lactar? La contestación a esa interrogante me parece que es evidente. Por ejemplo, nuestra Asamblea Legislativa ha realizado numerosas expresiones al respecto. En la Sección 2 de la Ley Núm. 155 de 10 de agosto de 2002 se expresó que el "lugar habilitado" para que una mujer pueda lactar o extraer su leche debe ser uno que garantice la "*privacidad*, seguridad e higiene." 29 L.P.R.A. Sec. 478 *et Seq.* Si la sociedad no está dispuesta a reconocer la intimidad que conlleva el

acto de lactar, ¿por qué entonces exigir estatutariamente que el lugar habilitado debe ser uno **privado?**

Por otro lado, la Sección 1 de ese estatuto expresa que todas las corporaciones públicas y agencias deberán designar áreas "para salvaguardar el <u>derecho a la *intimidad*</u> de las lactantes que interesen lactar a sus criaturas". *Id.* Asimismo, en la Exposición de Motivos de la Ley 65-2005 – que enmendó la Ley Núm. 155, *supra,* – la Asamblea Legislativa se autoimpuso el requisito de proveerle a las madres trabajadoras que laboraran en esa rama constitucional el derecho a un lugar en el que "puedan extraerse la leche materna y así brindarle el espacio y la *intimidad* que necesita para ese proceso". El mismo escenario ocurre en la jurisdicción federal, ya que en la Sección 7 del *Fair Labor Standards Act* el Congreso estableció lo siguiente:

> ***(r) Reasonable break time for nursing mothers***
> ***(1)*** *An employer shall provide—*
> ***(A)*** *a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and*
> ***(B)*** *a place, other than a bathroom, **that is shielded from view and free from intrusion from coworkers and the public**, which may be used by an employee to express breast milk.* 29 U.S.C. Sec. 207. (Énfasis suplido).

Estos ejemplos básicos explican por qué es evidente que una madre lactante cumple con el criterio **objetivo** en cuanto a que la sociedad está dispuesta a reconocer su expectativa de intimidad durante el acto de lactar o extraerse leche materna. Toda esta legislación de

envergadura aprobada durante los últimos veinte años, tanto en la esfera federal como en la estatal, va dirigida a reconocer esa **intimidad** y **privacidad** que como sociedad hemos aceptado que conlleva -como cuestión inherente- la lactancia materna. Ciertamente, como todo interés de privacidad, un ciudadano puede renunciar a su expectativa de intimidad mediante actos afirmativos. Es decir, el acto de lactar puede ser uno público <u>**de así decidirlo la madre lactante**</u> y ello estaría enmarcado dentro de su facultad de tomar decisiones sobre su vida privada. No obstante, no hay duda que, bajo los hechos particulares de este caso, **la peticionaria quería que su privacidad fuera respetada al momento de extraerse leche materna en su lugar de empleo.** De modo que realizó actos afirmativos a esos efectos.

El acto de lactar o extraer leche materna implica el que una mujer se despoje parcialmente de sus vestidos, exponga partes incuestionablemente íntimas de su cuerpo y, desde las entrañas de su propio ser, le provee lo que ella y solo ella le puede proveer a su bebé: un alimento puramente maternal. Francamente es doloroso que en este Foro existan juristas que no reconozcan la intimidad y privacidad inherente que para algunas mujeres conlleva ese acto. Lo expresado por el Juez Asociado señor Martínez Torres denota y destila un pensamiento patriarcal aterrador que, en lo personal, pensaba había sido superado por nuestra sociedad. ¡Qué lástima!

En fin, no me queda más que hacer un llamado a los patronos en Puerto Rico y advertirles a que repasen detenidamente las obligaciones que les impone la Ley Núm. 427, *supra.* Debe quedar meridianamente claro que las características que debe cumplir el lugar provisto a las madres lactantes para la extracción de leche materna no queda a la merced de su concepción de lo que es "habilitado" por ser más conveniente y menos oneroso para su negocio. Es decir, para efectos de la Ley Núm. 427, *supra,* "habilitado" no es sinónimo de conveniencia. El lugar que la Ley Núm. 427, *supra,* les exige a los patronos que habiliten para la extracción de leche materna, como mínimo, tiene que ser uno **privado, seguro e higiénico**. Cumplir con estos requisitos no implica que el patrono tenga que construir una estructura o facilidad para esos efectos. Sino que, dentro de las facilidades y las realidades de su negocio, tiene que cerciorarse que como mínimo el lugar que le provea a la madre lactante sea una privado, seguro e higiénico. Para algunos patronos -debido a la naturaleza de su taller laboral o por falta de empatía- cumplir con lo anterior podrá resultar difícil o poco conveniente, pero no imposible.

Ya es momento que los patronos en Puerto Rico se sensibilicen con las necesidades de las madres obreras que componen gran parte de la fuerza laboral en Puerto Rico y que dejen atrás nociones arcaicas. Para aquellos que se les imposibilite esta tarea, les recuerdo que cumplir con

los mandatos de la Ley Núm. 427, *supra,* no queda a la merced de su discreción ni al antojo de su conveniencia.

                              Mildred G. Pabón Charneco
                                    Jueza Asociada